# THE STATE v. CARL DELBONO and FRANK DELBONO, Appellants.

### Division Two, December 31, 1924.

1. **INSTRUCTION: For Manslaughter: In Murder Trial: Uncontrollable Passion.** A provocation from which the jury may infer that the homicide was committed under the influence of such uncontrollable passion as to reduce the crime to manslaughter must be an actual assault upon the person who commits the crime, and a threatening attitude and gesture are not sufficient. And where only one of four brothers was hit by the squirrel shot fired by deceased's companion, and he only slightly, even if that could be considered sufficient provocation at the time for the one not hit, an instruction on manslaughter is not proper where three-quarters of an hour or more intervened between such shooting and the time they returned to the scene and killed the seventeen-year old boy, during which time none of them was under the influence of sudden passion, but were cool and manifested a rational state of mind.

2. **CONSPIRACY: Proof: Secret Conference.** A conspiracy may be shown by circumstantial evidence; it is not necessary, in order to establish a conspiracy, to prove by direct evidence an agreement to commit a crime; and because of the difficulty of procuring direct evidence, it must generally be shown by circumstances. Proof that four brothers conversed excitedly together in Italian, effectively a secret conference, because their talk was not understood by any American who heard it, and that immediately thereafter one of them ran towards his home and came back, and all of them got in an automobile and proceeded to the place where deceased was immediately killed, together with other kindred facts, makes a case for the jury on the question of conspiracy.

3. **EVIDENCE: Affidavit for Continuance.** The admission in evidence of affidavits made by defendants at a previous term in support of their application for a continuance, in which were set forth what two witnesses if present would testify, although hearsay, is not error, where the statements therein are not harmful to defend-

ants, but in fact are favorable to them, and tend to confirm the testimony of one of their own witnesses. Nor can they be held to have impressed the jury that said witnesses were present and that defendants failed to call them, where it is stated in the affidavits that they were absent in other states and could not be produced, and there is nothing in the record indicating that any improper use was made of the statements contained in the affidavits or that any advantage was attempted to be taken of the defendants because such witnesses were absent.

Citations to Headnotes: 1, Homicide, 29 C. J. par. 119 and 30 C. J. par. 659; 2, Conspiracy, 12 C. J. par. 226, and Homicide, 30 C. J. par. 640; 3, Criminal Law, 17 C. J. par. 3664, and Evidence, 22 C. J. par. 392.

Appeal from Vernon Circuit Court.—*Hon. Charles L. Henson,* Judge.

AFFIRMED.

*Callery & Callery, Thomas W. Martin* and *Ewing & Ewing* for appellants.

(1) The court erred in not giving an instruction on manslaughter. When a person is assaulted with a deadly weapon, or is violently beaten by another with his fists, and the assaulted person after an interval of time meets and kills his assailant, the prior assault upon the accused and the consequent anger aroused thereby raises the question of a killing in the heat of passion under sufficient provocation, and entitles the accused to instruction on manslaughter. State v. Conner, 252 S. W. 713; State v. Grugen, 147 Mo. 29; State v. Bates, 239 Mo. 507; State v. Weiners, 66 Mo. 27; State v. Vest, 254 Mo. 465; State v. Health, 221 Mo. 565; Bond v. Williams, 279 Mo. 215; Cook v. Nealy, 143 Mo. App. 632. (2) The court erred in giving the instructions on the question of conspiracy. There was no evidence of conspiracy in this case; and there was very strong testimony that neither of the defendants were present at the time of the homicide, or took part therein. Am. & Eng. Ency. Law (2 Ed.) p. 52; State v. Porter, 276 Mo.

387, and cases cited at page 396; State v. Porter, 199 S. W. 158; State v. Hickman, 95 Mo. 332; State v. May, 142 Mo. 152. (3) The court erred in admitting in evidence the application for continuance filed by appellants and James Brown, their codefendant, in this case. This application contained no admission of confession of appellants. Upon its face the matters contained therein, and which were admitted in evidence, plainly were hearsay. It was not admissible for any purpose, and was highly prejudicial. Stephens v. Vrooman, 16. N. Y. 381; People v. Smith, 172 N. Y. 235; Austin Electric Ry. Co. v. Foust, 63 Tex. Civ. App. 102; Merchants Transfer Co. v. Joesting, 89 Ill. 152.

*Jesse W. Barrett*, Attorney-General, *J. Henry Caruthers*, Assistant Attorney-General, for respondent; *W. M. Bowker* of counsel.

(1) Under the statute, one who aids and abets another in the commission of a murder, or who is accessory thereto, is equally guilty with the principal. R. S. 1919, sec. 3689. (2) The court properly instructed the jury, under the evidence, upon the theory of conspiracy, and also upon the theory that the defendants aided and abetted in the commission of the crime in question. State v. Walker, 98 Mo. 95; State v. Lewis, 273 Mo. 518; State v. Porter, 199 S. W. 158; State v. Vaughn, 200 Mo. 1; State v. Reich, 239 S. W. 835. (3) A conspiracy may be proved by circumstantial evidence, and may be inferred. State v. Walker, 98 Mo. 95. (4) The acts of any one of the conspirators is binding upon all the conspirators and they are equally guilty. State v. Walker, 98 Mo. 95, and other cases supra. (5) The evidence did not warrant the giving of an instruction on the theory of manslaughter. State v. Spaugh, 200 Mo. 571; State v. Noland, 229 S. W. 199; State v. Cruts, 288 Mo. 107; State v. Allen, 234 S. W. 837. (6) Where the defendant denies all guilt and depends and relies upon the theory of an alibi, and the State claims murder, there is no

room for an instruction for manslaughter. State v. Spaugh, 200 Mo. 571. (7) An application for a continuance made by defendants at a former term is admissible as an admission against them. State v. Young, 99 Mo. 666; State v. Hays, 78 Mo. 307.

WHITE, J.—In the Circuit Court of Vernon County, January 17, 1923, the defendants were found guilty of murder in the second degree; the punishment of Carl Delbono was assessed at fifteen years' and that of Frank Delbono at ten years' imprisonment in the penitentiary. One James Brown, included in the same information and tried at the same time, was acquitted.

The defendants were charged with the murder, August 29, 1922, of H. M. Nowlin, a boy of seventeen years of age. The Nowlin boy was a son, by a former marriage, of Mrs. J. W. Holman, who, with her husband, J. W. Holman, lived at Tulsa, Oklahoma. She had another son by the former marriage, Robert Nowlin, aged twelve years, and her husband had a daughter fifteen years of age, named Mary-Will. Mr. and Mrs. Holman and the three children drove from Tulsa, with the intention of taking the daughter of Holman to Huntsville, Missouri, and H. M. Nowlin to Mexico, Missouri, to enter school. Accompanying the party was Walter Sweeney. Holman was in the oil business, and Sweeney was his employee.

On the night of August 28, 1922, the party camped at an outing camp west of Moundville, in Vernon County, and August 29th spent the day at that camp until late in the afternoon when they started to the home of Walter Sweeney's parents about two miles east of Moundville. The boy, H. M. Nowlin, was driving a Hudson car, in which were Mr. and Mrs. Holman and Holman's daughter, Mary-Will. Following that car was a Ford truck driven by Walter Sweeney; accompanying him was the younger Nowlin boy, Walter. The party drove through Moundville and beyond to a point a mile and a half east of that town, where was a concrete culvert sixteen feet in length across the road, more to the north side of the

road than to the south side.  At that point they met a Ford car containing one Henry Dazey, Sam Delbono, Joe Delbono, and appellant Carl Delbono.  Sam, Joe, Carl and Frank Delbono were brothers, engaged in the coal mining business at Moundville.  By the time the cars met at the culvert about 7:30 in the evening, it was dark.  The Hudson car, besides the two headlights, had a spotlight on the left side, which the Delbonos claimed blinded them.  The driver of the Hudson car said that the Ford car had blinding headlights.  The Ford car drove up near the centre of the road, so that the driver of the Hudson car, in order to avoid a collision, ran it off the culvert into the ditch and was unable to proceed.  As the Ford car passed the Hudson car, Sam Delbono, who was driving the Ford, called out, "Why in the hell don't you turn out that spotlight?"  The Nowlin boy replied, "You had better come and turn it out for me."  As the Ford car passed on west, Walter Sweeney, in the truck, drove up and got out.  After the Ford had got a distance of 50, 75 or 125 yards, according to the different witnesses, Sweeney fired a shotgun, loaded with squirrel shot, at the Ford car.  Some of the shot went through the curtain of the car, and two or three of them struck Dazey, went through his clothing, but did not break the skin.  One shot struck Joe Delbono on the side of the face or chin, and drew a little blood.  Sweeney at the trial swore that the Ford had stopped and the occupants were waving their hands and talking excitedly, and he thought they were coming back when he fired the shot from the hip and into the air.  The occupants of the Ford swore they did not stop.

The Delbono car drove on to Moundville and first stopped at a telephone office, where Dazey attempted to call up the sheriff at Nevada.  They were unable to get the sheriff.  Soon afterwards the Ford car was driven up in front of Carr's restaurant, and then almost immediately went away towards the east.

In the meantime a Mr. Eaton drove up to where the Hudson car was in the ditch and took the Holmans,

Sweeney with his truck and the younger Nowlin boy on to the Sweeney house a half mile further on, for the purpose of getting a jack and other implements in order to get the Hudson car out of the ditch. H. M. Nowlin stayed with the Hudson car. He retained also the shot-gun used by Sweeney. The others returned in about forty minutes and found H. M. Nowlin dead. He had been shot three times; in the head, in the chest and in the leg. They had heard no shots. Other evidence showed that the Delbono car was driven up from the direction of Moundville, turned across the road, three men got out and one said to the Nowlin boy in broken English: "You shoot me and we come back to kill." The boy defied them and told them they would not shoot anybody. Immediately the firing began, and about seven revolver shots were fired. The occupants of the Del-bono car then got in and drove on east. A cap, also a revolver scabbard, identified as the property of Joe Delbono, were found on the spot not far from the boy's body. The shotgun which had been left with the boy was several feet from his body and apparently had not been fired.

It is the theory of the defense that only Joe Del-bono and Sam Delbono were engaged in the homicide. Those two disappeared that night and were not seen again by anybody in Moundville, and have never been apprehended.

It is the theory of the State that when the Delbono car came to Moundville, after the incident where Sweeney shot into their car, the Delbonos armed themselves and all together returned to the culvert where at least two, and possibly three, of them engaged in the shooting; that before leaving Moundville they formed a conspiracy or design to commit the murder. The Delbono car was identified by its lights—one clear and one dimmed by a green triangular dimmer. Frank and Carl Delbono were married and had families. Sam and Joe boarded with them.

After the Delbono car stopped at the telephone office from where Dazey was unable to reach the sheriff, the State offered evidence to show that the three Delbonos, Sam, Joe and Carl, drove from there to the residence of Frank Delbono; that Frank Delbono ran out and got into the car, and that it went past the Carr restaurant where James Brown, seventeen years of age and a brother-in-law of Carl Delbono, got into the car; that the car containing the five men went east on the road leading to the culvert where the killing afterwards occurred.

The evidence is conflicting as to how many were in the car, at that time and afterwards. Dazey testified that the car passed his house going east after leaving the restaurant; that it was well loaded with passengers. A farmer named Combs, who lived less than a quarter of a mile east of the culvert, testified that after the shooting an automobile resembling the Delbono car passed his place with five people in it; that he was about forty-five feet from the car. Adam Roth, who was in his barn lot about forty or fifty yards from the culvert and was an eyewitness to the shooting, said that he saw three men get out of the Ford car immediately before the shooting began. He did not know how many remained in the car.

A Mrs. Ramsey who lived near Frank Delbono's house testified that when Frank Delbono came out of his house to get into the car two people were in it. When the Holmans returned from the Sweeney place to the culvert, they met the Delbono car, the driver of which, apparently intending to avoid recognition, turned far out of the road in a very peculiar manner. Holman thought three or four men were in the car as it passed that way. About nine o'clock that night, after the news of the killing came to Moundville, Frank Delbono came home bareheaded and without shoes on, according to the testimony of Mrs. Ramsey, who lived next door. Soon afterwards he came to her back door and asked her if the law had been there and asked about an attempt to identify the cap found at the culvert. Two or three days later he again anxiously inquired whether the law had

been there, whether anyone had said anything about his going in the car, and requested Mrs. Ramsey not to tell if she was asked about it.

The State offered further evidence to show that Frank Delbono and Carl Delbono were not seen about Moundville after the Delbono car drove east towards the scene where the murder afterwards was committed, until late at night after that car had returned. The State offered evidence tending to show talk among the Delbonos, probably chiefly by Joe, about their coming back to get their guns in order to go back and "kill them."

James Brown testified that when the Delbono car drove up in front of Carr's restaurant it contained Sam and Joe Delbono; that he (James Brown), Frank and Carl got on the running board, but did not get into the car; that when the car drove on, all three of them got off and he went home. Carl and Frank Delbono testified to the same facts, saying they also got off and went home. They had some conversation and Joe and Sam said they were going to Armour, Kansas, to get some powder to use in their mines.

The defendant offered further evidence to show that about nine o'clock the Delbono car drove up in front of Delbono's house, that Frank Delbono went out and Joe told him about the killing, giving his own version of the matter, saying that he thought Nowlin was going to shoot him. Frank then told Joe that he was a damned fool, and that he was going to have trouble; that Frank never saw Joe nor Sam after that.

On this evidence Frank and Carl were found guilty as stated, and appealed.

I.   It is claimed by the appellant that the court erred in failing to give an instruction on manslaughter. Counsel for appellant points out that the defendants

Manslaughter.   were laboring under excitement caused by the firing of a shotgun which drew blood from Joe Delbono; that while under such intense ex-

citement they committed the homicide, and it was for the jury to say whether the circumstances were such that the killing was accomplished under the influence of such uncontrollable passion as to reduce the crime to manslaughter.

The general rule is that a provocation from which such uncontrollable passion may be inferred must be an actual assault upon the person who commits the crime, that threatening attitude and gesture are not sufficient. [State v. Northington, No. 25657, decided at this term of this Court and not yet reported, and cases there cited.]

In the present case the only one of the Delbonos injured by the shotgun fired was Joe, and he was only slightly injured. Carl Delbono was not touched; Frank Delbono was not present, and it cannot be said that he had the necessary provocation. It may be doubted whether, under the circumstances the firing of the shotgun, which was shown to contain squirrel shot, would be sufficient provocation on the part of one not hit, as Carl Delbono was not hit. Dazey, who was hit, apparently was not excited about it.

But the reason why the instruction on manslaughter was not proper was because the evidence shows that, in the time intervening between the first incident at the culvert and the killing, the Delbonos were not under the influence of sudden passion. They were cool enough to go to the telephone office and attempt to call up the sheriff. This incident showed the most rational and reasonable state of mind. It was an attempt to procure the intervention of an officer of the law—a proceeding entirely inconsistent with the uncontrollable excitement which causes one to strike blindly and without reflection. If the Delbonos were aroused to uncontrollable passion by Sweeney's shot they allowed reason to resume control at the telephone office. In order to apply appellants' theory, it must be assumed that immediately, failing to get the sheriff, they relapsed from a rational to an irrational state of mind. It is said that afterwards at the restaurant Joe Delbono was wildly excited. Doubtless the Del-

306 Mo.—36

bonos were excited as they talked about it, but not so excited as to prevent the formation of a plan to go out and seek vengeance.

The case of State v. Connor, 252 S. W. 713, is cited by appellant in support of his contention that an instruction on manslaughter should have been given. In that case the defendant had been twice beaten and cuffed until he was almost insensible and aroused to a frenzied state of mind. He rushed home, returned in ten or fifteen minutes with a weapon, and committed the homicide for which he was tried. All the evidence tended to show that he was still irrational from the beating. This court held that it was for the jury to say whether he committed his homicide while under the influence of that excitement. The circumstances are wholly unlike the facts presented in this case.

II. It is further assigned as error that the court gave the usual instructions relating to conspiracy. It is not claimed that the instructions are erroneous in form, but that there was no evidence of a conspiracy on which to base such instructions.

A conspiracy, like any other fact, may be shown by circumstantial evidence: it is not necessary to prove by direct evidence an agreement to commit a crime in order to establish a conspiracy. [State v. Fields, 234 Mo. l. c. 623; State v. Shout, 263 Mo. l. c. 363; State v. Lewis, 273 Mo. 531; State v. Walker, 98 Mo. l. c. 104.] Because of the difficulty of procuring direct evidence, generally it must be shown by circumstances.

Appellant argues that there was no evidence of secret conferences between the defendants after the first incident at the culvert. On the contrary, there is considerable evidence. It was proven that the defendants conversed excitedly, in Italian; that all the Delbonos talked together in a foreign language, so that the Americans could not understand what was said. It was just as effectively secret as if it had been behind closed doors. That talk was followed by their action.

There was evidence tending to show that, after the attempt to get the sheriff at the telephone office, Carl ran towards his home and came back; that they drove in the car to Frank's home; that Frank got in the car and all drove away together; that they drove by the Carr restaurant where Jimmie Brown got into the car; that all the Delbonos left in the car for the place where the shooting afterwards took place, and that there were four or more men in the car on the way out, and after the shooting before it returned to Moundville. It is not said by the State, but the not impossible inference arises that Joe's cap and scabbard were planted by the Delbonos to divert attention from the others, for Sam and Joe immediately disappeared. From the circumstances the jury might very properly infer that all four of the Delbonos went to the scene of the crime and were present at the time of the killing; that Frank Delbono, from his actions before the killing, and his subsequent conduct, was a party to the contemplated enterprise. According to their own story, they all talked together just before the car left for the scene of the crime. It is highly improbable that Frank and Carl did not know the purpose of the expedition, even if one or the other did not go. The evidence was sufficient to warrant the instructions on conspiracy.

III. It is next assigned as error that the court admitted in evidence an affidavit for a continuance presented at a former term of court. The affidavit was sworn to by Frank Delbono, Carl Delbono and James Brown. It stated that defendants could not safely go to trial at that term of the court because of the absence of two material witnesses, Joe Lazara and James Sclementi. The affidavit then sets out the fact showing diligence in an attempt to get such witnesses, and that Joe Lazara, if present, would swear that he was in Moundville on the night of August 29th, on the street near Carr's restaurant, and saw an automobile driven by Sam Delbono going eastward a short time before eight

o'clock; that he saw James Brown, Carl Delbono and Frank Delbono get on the running board of said automobile, saw them ride down the street some distance, saw all of said defendants get off said automobile, and saw said automobile drive on east and south, driven by Sam and Joe, and that the defendants got off the car and started away in opposite directions from the way in which the automobile went; that James Sclementi, if present, would testify to the same facts.

It is claimed by the appellant that this evidence is pure hearsay, as undoubtedly it is, but it is also a statement by defendants regarding facts which could be proved. It has been held by this court that such an affidavit is admissible against the party making it, as an admission. [State v. Young, 99 Mo. 666; State v. Hayes, 78 Mo. l. c. 318.] See also 22 Corpus Juris, page 344, where the general doctrine is stated; an application for a continuance may be put in evidence where it contains admissions.

However, we find it unnecessary to say, as a general rule, whether such an affidavit may be admitted in evidence. In the present case there is nothing harmful to the defendants in the statement. In fact, it is favorable to them. Defendants offered evidence to show that when that car stopped in front of the restaurant, James Brown, Frank Delbono and Carl Delbono got on the running board, and *after* the car started they got off and went to their several homes. The statement in the affidavit for continuance as to the absence of the witnesses and what their testimony would be is practically to the same effect, the only difference is that it says they rode down the street "some distance." "Some distance" might be a few feet or it might be to the next block. James Brown in his testimony said the car started and went "not very far," "a short distance." He said that Carl got off the running board after the car had gone twenty-five or thirty feet, Frank after it had gone about twenty-five feet further, and that he,

Brown, rode a block. The "some distance" mentioned in the affidavit is not inconsistent with that evidence.

The significant thing about the affidavit, as well as the evidence offered by the defendant, is that the three were not in the car, got off the running board, and were not with it afterwards as it went east. The theory of the State was that all of the Delbonos were *in* the car and went east in it.

The point made by appellants is that no explanation was made as to why the witnesses were not present at the trial, and the jury probably were impressed with the belief that the witnesses were present, and the defense failed to produce them. There appears in the record no ground for such conclusion. Counsel for the State say in their brief that the absence of such witnesses was not commented upon in the argument. The application states they were absent in other states and could not be had at the time the affidavit was made. There is nothing in the record to show that any improper use was made of that statement, or that the State attempted to take any advantage of the defendants in respect to the absence of such witnesses.

The court, in overruling the objection by the defendants to the admission of the affidavit, stated that he thought the jurors ought to know for what causes and under what circumstances the statements were made. No objection was made by the appellants to this statement of the court, and we are not apprised that it was intended, or had the effect, to prejudice the defendants. We are unable to find any harmful error in the admission in evidence of the application for a continuance.

The record shows that the case was well tried, and ably and vigorously defended; we find no error in the record which would warrant a reversal.

The judgment accordingly is affirmed. *David E. Blair, P. J.,* concurs; *Walker, J.,* absent.