THE STATE v. CHAMBERS BUCKLEY, Appellant.—298 S. W. 777.

Division Two, October 10, 1927.

18

*Henry P. Lay* for appellant.

*North T. Gentry,* Attorney-General, and *Smith B. Atwood,* Assistant Attorney-General, for respondent.

HIGBEE, C.—This is a second appeal. An information was filed in the Circuit Court of Benton County, charging the defendant and his son Earl Buckley and Claude Estes with murder in the first degree. There was a mistrial on August 13, 1923. On the second trial, begun on August 24, 1923, the defendant and his son Earl were found guilty of murder in the first degree and sentenced to imprisonment in the penitentiary for life. On appeal, the conviction was reversed and the cause remanded. [State v. Buckley, 309 Mo. 38, 274 S. W. 74.] A second amended information was filed on December 9, 1925, charging the defendant and his son Earl and Claude Estes with murder in the first degree in that on June —, 1922, they assaulted, shot and killed Alfred E. Lutman with a rifle and pistol, each loaded with gunpowder and leaden balls. A severance was granted to Chambers Buckley, and on a trial begun on December 16, 1925, he was found guilty as charged and his punishment assessed at imprisonment in the penitentiary for life. From a sentence in accordance with the verdict the defendant appealed.

It is admitted by the appellant that the *corpus delicti* was proven, and it is said that the facts proved at the second trial are correctly stated in the opinion of the court on the first appeal. Appellant's counsel also states that the evidence for the State on the last trial was substantially the same as at the former trial, and that there was also additional evidence on the part of the State.

Lutman lived alone on his farm in Benton County, adjoining the defendant's farm on the west. There was and had been enmity between them for years. Lutman was last seen, as far as the evidence shows, on June 11, 1922. The theory of the prosecution is that the Buckleys conspired together to kill Lutman, and employed Claude Estes to shoot and kill him, and that thereafter, on the afternoon of June 14, 1922, the defendant Chambers Buckley, and Claude Estes, the latter carrying a rifle, were seen together in a cornfield on Buckley's farm near the east line of Lutman's farm; that Estes went toward and disappeared in the brush on Lutman's farm, and defendant returned to his home. Later in the afternoon, Claude Estes went to defendant's house and left the rifle there. On July 14, 1922, Lutman's decomposed body was found on his farm, in a very small clearing surrounded by dense brush; there was no flesh on the skeleton; there was a hole in the skull over one eye, about the size of an ordinary lead pencil or .38 ball, and one in the cheek. After the inquest and burial the body was exhumed and a gunshot wound was

found on Lutman's left breast, about the size of a .38 bullet. Two or three weeks later three or four empty .22 cartridge shells were picked up near the spot where Lutman's body was found.

It is contended that the demurrer to the evidence should have been sustained; that there was no proof of a conspiracy between Chambers Buckley, Earl Buckley and Claude Estes to kill Lutman; that the statements of Earl Buckley and Claude Estes made out of the presence of the defendant were hearsay and their admission in evidence was prejudicial error.

We do not agree with appellant's learned counsel that the evidence at the last trial was the same as at the second; it is the same in most respects, but in others it is not the same. There was also some important additional evidence developed at the last trial. In the consideration of appellant's contentions it will be helpful to set out some of the evidence offered by the State at the last trial.

Jim Hart testified: I had a conversation with Chambers Buckley about the time the coroner's jury was trying the case. He referred to the cutting of a bee tree; he said, I think they will find out who killed Lutman if they will find out who cut the bee tree. He didn't say who cut the bee tree, but said if they would find out who cut the bee tree they would find out who killed him.

Everett Forth, defendant's son-in-law, testified: I had a conversation with Chambers Buckley with reference to the killing of Lutman; he asked me if I remembered the incident of the cutting of the bee tree on Lutman's farm. Jess Compton and I found a bee tree and were talking at my house about cutting it. Buckley came down and said: "Let's go and cut it." I said, let's wait till evening and it will be cooler and Mr. Lutman is liable to be down there on his land following the fence and if he catches us down there he would raise the dickens with us. Buckley said: "There is no danger." Later that evening we cut the tree; that was on June 18, 1922. A week or ten days later I asked Buckley if he knew there wasn't any danger in cutting the bee tree. He said: "I knew there wasn't any danger, for I seen it with my own eyes." He had about three .38 shells in his hand. He didn't say what he saw. I heard Buckley say a few times that Lutman might be found some time with the buzzards picking his bones. This tree was on Lutman's farm about six feet from the fence dividing the Lutman and Buckley farms.

C. M. Davidson testified: In the spring of 1922, the defendant was at my house one night. In the conversation he said he and the boys were building a fence on or near the line between him and Lutman. He said the boys did the work, and that he had a gun and watched; he said he expected Lutman to come there and interfere with the work; he didn't come, and it is a good thing; he said he figured Lutman would come that night and pull the posts; if he had come to pull the posts we aimed to kill him.

Grover Mabry testified that in a conversation with the defendant, Buckley told witness that Claude Estes came to his house and got the gun and went off towards Lutman's house; that he said: ''I heard the gun shoot and I just knew that there was a dead man if he hadn't missed.'' And I don't remember what I said; something about what did they pull such a stunt for, or something to that effect. He said Claude came back that evening and said he killed him. He didn't say whose gun it was; he said he came by there and got it. He said something about Forth talking. ''Q. What did he say, if anything, in reference to whether he had told Forth about the killing of Lutman? A. He said that him and Forth went down to cut a bee tree and he told Forth about it; that Forth was talking too much.'' I asked him why he told Forth or how Forth came to know, and he said something to the effect that, when they went to cut the bee tree, he told Forth something about that it was all right; that he thought Forth was all right. All this conversation was about the killing of Lutman. He said Forth was talking too much; he said he had told Forth about it when he cut the bee tree. I am Earl Buckley's brother-in-law. Lutman was commonly known as ''Fritz'' or ''Old Fritz'' in the neighborhood.

On cross-examination, witness stated he did not remember if, on the former trial, he was asked if he had had conversations with Chambers Buckley about the killing of Lutman, but that he was asked about Earl several times. Witness stated that at the time of the trial he was under arrest and in jail, charged with killing Lutman; that he had no promise of discharge if he testified right.

H. L. McDade testified: Referring to a lawsuit between Chambers Buckley and Lutman, I asked Buckley how he came out with Lutman. He said, they made me awful mad. If I had had my gun I don't know but what I would have hurt him. Then we talked for a few minutes and he says, if it occurs again I will crack down on him.

The State offered evidence as to statements made by Earl Buckley and Claude Estes, which were admitted over the objections of the defendant that they were not made in the presence of the defendant and were hearsay. The court, in overruling the objections, said the prosecuting attorney announced he expected to prove a conspiracy and that they would not be admissible unless the conspiracy were proved.

Arthur Allen testified: I had a conversation with Earl Buckley in March or April, 1922. Earl Buckley said he would like to go over and rock Lutman's house; raise a little hell with Lutman. Claude Estes says: Who would go? He was the only one that said anything, and he said, You and me and Charlie; says, We could get others to go; that was all that was said at that time, and the next time Earl Buckley ever mentioned Mr. Lutman . . . was one morning when Lutman was passing his place—he said it was Mr. Lutman . . .

and he made the remarks that it was too good a set of harness . . . for that s. o. b. to be driving . . . The next time . . . two or three weeks, something like that, Mr. Lutman passed Buckley's place again and he made remarks something about Lutman. . . . He said he would like to kill that s. o. b. During that day he asked me if I would like to trap Mr. Lutman, and he said by stretching a wire across the road at the foot of the hill on Mr. Lutman's way he would return home back from town, and hide and shoot off a gun and scare the team and cause the team to run away and throw Mr. Lutman out of the wagon, and I told him, No sir; I wouldn't go with him.

The witness related other conversations with Earl Buckley in which he suggested that they rock Lutman's house; that he would like to get that s. o. b. The witness, continuing: One day we were fixing a fence he mentioned to me about killing Alfred Lutman. He said he would give me $25 or $30, or get me a new suit of clothes if I would kill Alfred Lutman for him. Witness refused and Earl Buckley called him a coward and "everything else," and told witness not to tell it. Witness further stated that one night he and Claude Estes were at Earl Buckley's house and Earl told Claude Estes that the money was ready for him when he did the work; asked him when he was going to kill Mr. Lutman. Claude made no answer. Buckley threatened to kill witness if he told about it. These conversations were before June 14, 1922.

Everett Forth, being asked if he ever had had any conversations with Earl Buckley about "the killing," answered: He asked me if I told anyone about the Lutman deal and I told him, No. Well, he says, my wife knows it, and Grover Mabry's wife knows it and Alfred Duncan knows it; he says, do you suppose Alfred Duncan would tell? He says; I understand they offer a thousand dollars reward. I says I don't know what Alfred Duncan would do and don't care. Well, he says, I wouldn't tell it for ten thousand dollars.

Grover Mabry testified that Claude Estes told him on the day before the Henry Allen sale (June 15, 1922): I met Fritz and fed him three. I said, shut up; don't you know you will go to the penitentiary for that, or something like that, and I said does anybody else know it? And he said Mr. Buckley knew it. This was admitted over the objection that it was a statement by an alleged accomplice and that it was hearsay.

Oscar Estes testified that Claude told him that he (Claude) had killed Lutman; that Chambers and Earl Buckley hired him to do it. Witness had this conversation while Earl Buckley was in jail at Sedalia.

Elmer Estes testified that Earl Buckley asked witness to go to Kansas and tell Claude Estes to keep his mouth shut.

Ross Allen testified that in the latter part of 1921, Emmett Forth and Bob Spry being present, he heard Earl Buckley ask Emmett Forth if he wanted to make some money and said: If we would kill Alfred Lutman he would see that we got some money. We told him we didn't need it.

It is conceded by counsel for the defendant that on June 15, 1922, Chambers Buckley gave Claude Estes a check on Osage Valley Bank for ten dollars.

Briefly recapitulating: It was in evidence that in the spring of 1922, Chambers Buckley told C. M. Davidson that he and the boys were building a fence on or near the line between him and Lutman; that the boys did the work and that he, Buckley, had a gun and watched; that he expected Lutman to come there and interfere with the work. . . . "If he had come to pull the posts we aimed to kill him." Buckley told Grover Mabry that Claude Estes came to his house and got the gun and went toward Lutman's house. Buckley said, "I heard the gun shoot and I just knew there was a dead man if he hadn't missed;" that Claude came back that evening and said he had killed him. In the latter part of 1921, Earl Buckley promised money to Ross Allen, Emmett Forth and Bob Spry if they would kill Lutman. We have referred to other statements made by Earl Buckley.

We have here both direct and circumstantial evidence of a conspiracy.

"The conspiracy may be proved by proving circumstances from which it may be presumed; as, if the parties steadily pursue the same object, whether acting separately or together, by common or different means, all leading to the same unlawful result." [Kelley's Crim. Law, sec. 925, and cases cited.]

"A conspiracy, like any other fact, may be shown by circumstantial evidence: it is not necessary to prove by direct evidence an agreement to commit a crime in order to establish a conspiracy. [State v. Fields, 234 Mo. 1. c. 623; State v. Shout, 263 Mo. 1. c. 363; State v. Lewis, 273 Mo. 531; State v. Walker, 98 Mo. 1. c. 104.] Because of the difficulty of procuring direct evidence, generally it must be shown by circumstances." [State v. Delbono, 306 Mo. 562, 268 S. W. 60.]

"A conspiracy may be proven by circumstances. It is not necessary to prove that parties who engage in a common enterprise to commit a crime made a definite agreement before committing the crime." [State v. Stamper, 314 Mo. 645, 285 S. W. 437, and cases cited; State v. Kinnamon, 314 Mo. 662, 285 S. W. 62.]

"The order of proof of a conspiracy with reference to the introduction of the evidence of the acts and declarations of the alleged con-

spirator, must be left largely to the discretion of the trial judge." [State v. Craft, 299 Mo. 347, 253 S. W. 224.]

We have not attempted to recapitulate all the evidence offered by the State at the last trial. What has been set out above, together with the evidence as summarized in the opinion of the first appeal, suffices for our present purpose. In our opinion it is sufficient to make a prima-facie case that the Buckleys and Claude Estes conspired to assassinate Lutman; hence the statements of either of the conspirators while pursuing their common purpose or design, made before the accomplishment of that purpose, were admissible in evidence against the defendant. [State v. Shields, 296 Mo. 402, 246 S. W. 932.]

"But declarations and confessions made after the transactions are fully over are admissible against the party only who made them, and one conspirator is not liable for the acts of another outside of and independent of the conspiracy." [Kelley's Crim. Law, supra.]

"It is the settled law of this State that declarations of a coconspirator, made after the common criminal enterprise has been accomplished and merely narrative of past occurrences, are inadmissible against another conspirator." [State v. Forshee, 199 Mo. 145, 97 S. W. 933; State v. Hayes, 249 S. W. 50 (3).]

The admission in evidence of statements made by Earl Buckley and Claude Estes after the consummation of the conspiracy was prejudicial error; it was mere hearsay.

It is also contended by appellant that there is no proof that Claude Estes shot and killed Lutman; hence that there is an entire failure of proof, and the demurrer to the evidence should have been sustained.

Appellant quotes from the opinion on the first appeal:

"The only proof as to the character of the wound in deceased's head is that it was caused by the entrance of a .38 caliber bullet. If the deceased came to his death from a .38 caliber bullet, it is certain that Estes did not kill him with a bullet from the .22 rifle. It is not shown that Estes carried any firearms of .38 caliber."

The State offered and read in evidence the testimony of the sheriff, Mr. Groomer, at the defendant's preliminary hearing, that he had searched the defendant's house and found a .22 Stevens rifle, but that he found no revolver. Mr. Groomer died before the trial.

There is evidence for the State that the defendant stated that Claude Estes came to defendant's house and got his gun; that he heard the shot and said, "I just knew there was a dead man if he hadn't missed;" and that defendant also said that Claude came back that evening and said he had killed him. This was on the afternoon of June 14, 1922.

No witness testified on the last trial that the hole found in Lutman's skull over his eye was made by a .38 caliber ball. The evidence on this point is that there was a hole in Lutman's skull over one of his eyes about the size of an ordinary lead pencil or .38 ball, and one in his cheek. After the body was exhumed, a gunshot wound was found on Lutman's breast about the size of a .38 bullet.

Two juries have found that the defendant was guilty as charged in the informations. In the light of the evidence the verdicts mean that they found that Claude Estes, at the instigation of the defendant, shot and killed Lutman with a .22 caliber rifle. These verdicts received the sanction of the trial court. If there was no substantial evidence to support the verdict, this court is required to set it aside, but if there was substantial evidence or facts from which the jury could reasonably deduce the defendant's guilt, we are without power to interfere.

It does not appear that search was made for the ball in Lutman's head. There was no direct evidence that .22 caliber balls are leaden balls, or that such balls, when shot from a gun become hot and softened by heat, and will, to some extent, ''mushroom'' and spread or flatten when they strike a hard substance like bone, or that if Lutman was shot and his skull pierced by such a ball, the hole would be larger than the diameter of the ball at the instant it was fired from the gun. It has been held that courts are required ''to take notice of current history, of geographical and scientific facts and of facts commonly known to all mankind'' (Reineman v. Larkin, 222 Mo. 170, 121 S. W. 307), and that ''the trend of the judicial mind is to expand the judicial horizon and, as decided cases ripen into precedents, it is made manifest that the list of things of which courts take judicial notice is being sensibly added to by growth.'' [State v. Railroad, 212 Mo. 676, 111 S. W. 500.] It is also held that ''courts take notice of whatever is or ought to be generally known within the limits of their jurisdiction, and that they ought not to assume ignorance of, or exclude from their knowledge, matters which are known to all persons of intelligence. . . . What may be a proper subject of judicial notice at one time or place may not be at another. . . . Although 'a fact must be pretty well known and pretty obvious besides before it can be taken judicial notice of,' it is not necessary for courts to wait, before taking judicial notice of a thing, until everybody knows and understands it. . . . The test has been said to be: (1), Is the fact one of common, everyday knowledge in the jurisdiction, which everyone of average intelligence and knowledge of things about him can be presumed to know? and (2), Is it certain and indisputable?'' [23 C. J. 59, 61; and see as to qualities and properties of matter, page 143.]

"But judicial knowledge of natural phenomena is limited by common knowledge, and consequently unique or obscure matters relating thereto will not be noticed without evidence thereof." [15 R. C. L. 1099; Chicago Ry. Co. v. Champion, 32 N. E. 874, 23 L. R. A. 861; Nix v. Hedden, 149 U. S. 304; State v. Wilhite, 132 Iowa, 226.]

We think the trial court could not have taken judicial notice that leaden balls are used exclusively in .22 rifles, or that a ball shot from such a rifle will make a larger hole in a man's skull than the diameter of the ball when it was fired from the gun; yet in the light of the evidence that is precisely what both juries found by their verdicts. The juries, in rendering their verdicts, had the right, and it was their duty, to use their common sense and to take notice of things generally known by people of intelligence in their jurisdiction, and "to judge of the weight and force of the evidence by their own general knowledge of the subject of inquiry." [38 Cyc. 1839.]

It was in evidence that Buckley saw Lutman's body or skeleton on the day on which it was discovered. The hole in the skull was examined and the opinion was expressed that it was about the size of a lead pencil, or a .38 caliber ball. If the jury accepted Mabry's evidence, they would reasonably conclude that Buckley believed that Claude Estes shot and killed Lutman with his (Buckley's) rifle. In view of the facts and circumstances in evidence we are of the opinion that if, on a retrial of this cause, it should become an issue whether or not Lutman was shot and killed by a .22 caliber rifle in the hands of Claude Estes, that would be a question of fact to be determined by the jury, aided by competent evidence as to whether a ball of that size could or would make the hole found in Lutman's skull.

The appellant does not assign error in the instructions given for the State and they need not be considered. Complaint is made, however, of the refusal of a cautionary instruction as to statements of "an alleged accomplice" in crime, when not corroborated by some person not implicated in the crime. It is not clear what is meant by an "alleged accomplice." The court is required to give the jury a cautionary instruction as to the evidence of an accomplice when a conviction is sought upon the testimony of an accomplice alone, but not as to the evidence of an *alleged* accomplice. [State v. Harkins, 100 Mo. 672, 13 S. W. 830; State v. Jackson, 106 Mo. 179, 17 S. W. 301; State v. Woolard, 111 Mo. 257, 20 S. W. 27; State v. Koplan, 167 Mo. 304, 66 S. W. 969, and State v. Merrell, 263 S. W. 121.] No accomplice of the defendant testified as a witness for the State; hence the court was not required to give a cautionary instruction.

The court erred in admitting evidence as to statements made by Earl Buckley and Claude Estes out of the defendant's presence, after the death of Lutman, over the objections of the appellant. For

these errors the judgment is reversed and the cause remanded. *Henwood, C.,* concurs; *Davis, C.,* concurs in result.

PER CURIAM:—The foregoing opinion by HIGBEE, C., is adopted as the opinion of the court. *White, P. J.,* and *Walker, J.,* concur; *Blair, J.,* concurs in reversing, but not in remanding the case.