THE STATE v. ROBERT EVANS and JOHN BLANKENBAKER, Appellants.— 23 S. W. (2d) 152.

Division Two, December 11, 1929.

R. M. Robertson and Louis J. Rasse for appellants.

*Stratton Shartel,* Attorney-General, and *Don Purteet,* Assistant Attorney-General, for respondent.

HENWOOD, C.—By an information filed in the Circuit Court of Johnson County, the defendants were jointly charged with robbery in the first degree. They were tried together and found guilty. The jury fixed the punishment of Evans at imprisonment in the penitentiary for five years and the punishment of Blankenbaker at imprisonment in the penitentiary for ten years, and they were sentenced accordingly. Their separate appeals, taken from the separate judgments entered, were briefed and argued together and will be disposed of in one opinion.

The prosecuting witness, W. T. Windsor, testified, in substance, as follows:

He was eighty-six years of age and lived alone in Jackson Township, in Johnson County. On January 30, 1928, he went to bed at "sundown." Later that evening, between. eight and nine o'clock, two men came to his house, knocked at the door, and asked for a hammer or pair of pliers to use in fixing their car. He told them he thought there was a hammer in the room, near the door. One of the men came into the room and looked around, but said he could not find the hammer. There were no lights in the room. He (Windsor) picked up his search light, which he kept near his bed, and, while "stooping over," looking for the hammer, this man threw his arms around him (Windsor), at his back, and said: "All right, Bill." Then, the other man came into the room and said: "Now, where is your money?" He (Windsor) said: "I haven't any money." The same man said: "Yes, you have." He (Windsor) said: "All the money I have is in my pants' pocket on the foot of the bed." As that man left the room, the man who was holding him (Windsor) said: "Did you get it?" Then, this man said to him (Windsor): "How much money did you have?" He (Windsor) said: "I think about seventy-five dollars." This man started to push him out of the room, through the doorway, and he said: "Don't push me out there." This man said: "I don't want anyone shooting at me." He said: "I have nothing to shoot with." This man said: "Start the car, Bill." This man held him until the car started, then ran to the car, in which both men left immediately. They took "seventy-five or seventy-six dollars" from his pants' pocket. The man who held him "didn't attempt any violence; nothing rough at all." He. did not know "exactly" who the robbers were. Early the next morning, he told three of his neighbors about the robbery. The defendant Blankenbaker had lived "about a quarter" from his house for several years. and had been there several times. A few days before the robbery, Blankenbaker and Gene Gibson hauled two loads of wood for him, and, when he gave Blankenbaker a "one dollar bill" for hauling the wood, Blankenbaker saw his roll of money.

Buford Gibson testified: He was charged with this robbery and arrested, but the charge against him was dismissed. He lived "about a quarter" north of Windsor's place and about three miles southwest of Chapel Hill, with his grandmother and his uncles, Gene and Sam Gibson, and his cousin, Roy Gibson. He served two years in the soldiers' prison at Leavenworth for desertion from the United States Army. He and the defendant Blankenbaker were "in Leavenworth together." Blankenbaker lived at his house both before and after they were at Leavenworth. On January 30, 1928, between six and seven o'clock in the evening, he and Blankenbaker drove to Chapel Hill in a Ford roadster. On the way to Chapel Hill, Alan Longacre came out of his house and stopped

them and asked them to bring him some tobacco. They left Chapel Hill, on their return trip, about eight o'clock. Soon after they left Chapel Hill, Blankenbaker said "he was to meet Evans" (the other defendant) along the road. Evans lived near Bates City, about six or seven miles north of Chapel Hill. About three-quarters of a mile from Chapel Hill, they found Evans standing by the side of his car, a Ford coupe. He heard Blankenbaker and Evans plan the robbery. Evans said to Blankenbaker: "Well, take everything off of you; shake yourself down—take everything out of your pockets." He (Gibson) said: "Where are you going?" Evans said: "To Mr. Windsor's to pull a job." He (Gibson) said: "You had better stay away from there; there is going to be hell raised." Blankenbaker got into the Ford coupe with Evans and told him (Gibson) he would see him on the road. Evans and Blankenbaker drove away together in the direction of Windsor's and soon disappeared from his (Gibson's) view. He followed in the Ford roadster, "quite a little ways" behind and driving "very slowly." He stopped at Longacre's and left some tobacco in Longacre's mail box. Not very long thereafter, he met Evans and Blankenbaker coming back from the direction of Windsor's in the Ford coupe, about three-quarters of a mile from Windsor's and about one-half of a mile from the Gibson home. Blankenbaker got out of the Ford coupe, driven by Evans, and went home with him (Gibson) in the Ford roadster. Evans drove on north in the direction of Chapel Hill and Bates City. On the way to their home, Blankenbaker told him "he got it." The next morning, Blankenbaker told him about the robbery. Blankenbaker said that Evans knocked at Windsor's house, asked for a hammer to fix his car, and told Mr. Windsor he was a stranger from Warrensburg; that Mr. Windsor told Evans there was a hammer near the water bucket; that Evans said he could not find the hammer; that Mr. Windsor got out of bed and began looking for the hammer with his flash light; that, when Mr. Windsor stooped over, Evans threw his arms around Mr. Windsor and called for him (Blankenbaker) to come and get the money; that he (Blankenbaker) got the money out of Mr. Windsor's pants pocket and went outside and started the car; and that, when the car started, Evans ran out to the car and they left together in the car. There was a sale between Chapel Hill and Bates City on the day of the robbery, and he saw Evans and Blankenbaker together, "talking together."

Alan Longacre testified that he lived on the road between the Windsor place and Chapel Hill; that, the evening of the robbery, he stopped Blankenbaker and Gibson at his (Longacre's) gate and asked them to bring him some tobacco from "town;" and that, "afterwards," he found the tobacco in his mail box.

A. C. Webb and Virgil Hart testified that they saw Evans at a filling station, a quarter of a mile north of Bates City, at eight o'clock in the evening of the robbery; and that he was driving south, in the direction of Bates City and Chapel Hill.

John Glote and Floyd Prater testified that they saw Evans and Blankenbaker together at the sale near Chapel Hill about three o'clock in the afternoon on the day of the robbery.

In behalf of the defendants, three witnesses, Miss Ollie Bartlett, Russell Markwell and Odell Barnett, testified that they saw Evans at the skating rink in Oak Grove, three miles from Bates City, the evening of the robbery. Miss Bartlett said Evans was there "something like an hour, something between eight and ten o'clock." Markwell said he saw Evans there "at various times from eight to ten o'clock." He admitted that he had been convicted and fined "for disturbing the peace." Barnett said he saw Evans there from "about eight until about nine-thirty." He admitted that he had been convicted, sentenced and paroled, "for stealing curtains off a car;" also, that he was convicted and "paid a fine for passing bad checks."

Buford Gibson, being recalled for further cross-examination, admitted that he had been convicted "for giving bad checks."

I. It is said that the evidence fails to show robbery by force, the offense charged, because the element of force is lacking. There is no merit in this connection. The proof that one of the defendants grabbed Windsor and held him while the other took his money, in his presence and against his will, is amply sufficient to show that they committed robbery *by force* and to sustain their conviction for that offense. [Sec. 3307, R. S. 1919; State v. Spivey (Mo. Sup.), 204 S. W. 259; State v. Graves, 185 Mo. 713, 84 S. W. 904.] In our opinion, this robbery was well planned and well executed, the robbers using only such force as was necessary to accomplish their purpose. Windsor's statement that the man who held him "didn't attempt any violence" merely means that he was not subjected to any bodily injury or torture.

II. It is also said that the trial court erred in permitting the State's witnesses, Gibson and Prater, to testify that the defendants were together at a sale on the day of the robbery, and in permitting another one of the State's witnesses, Webb, to testify that he saw the defendant Evans driving south, in the direction of Chapel Hill, at eight o'clock in the evening of the robbery. The record shows that no timely objection was interposed to the testimony of these witnesses along this line. However, this testimony was clearly admissible. The proof that the

defendants were together at a sale a few hours before the robbery tends to show that they were companionable, and that they had an opportunity, at that time, to formulate plans for the robbery. And the proof that the defendant Evans was seen, later that evening, driving in the direction of Chapel Hill, tends to corroborate the testimony of Gibson to the effect that the defendants met, by appointment, about three-quarters of a mile south of Chapel Hill, and perfected their plans for the robbery, shortly before the robbery occurred. It follows that no error was committed by the trial court in this particular.

III. It is seriously urged that the trial court erred in refusing to give the defendants' instructions marked "A" and "B," or a similar cautionary instruction relating to the testimony of an accomplice, and in failing to give a cautionary instruction relating to the alleged oral statements and admissions of the defendants.

No accomplice testified in this case. True, Gibson was originally charged with participation in this robbery, but the charge against him was dismissed prior to the trial of the defendants, and there is no evidence tending to show that he was, in fact, an accomplice. On the contrary, there is evidence tending to show that he advised and warned the defendants not to commit this robbery. Obviously the charge against him was dismissed because no evidence was found to support it. Therefore, the trial court properly refused the defendants' instructions A and B and properly refused to give any cautionary instructions relating to the testimony of an accomplice. [State v. Merrell (Mo. Sup.), 263 S. W. 118; State v. Buckley, 318 Mo. 17, 298 S. W. 777.]

A cautionary instruction relating to the alleged oral statements and admissions of the defendants involved a collateral matter and was not necessary for the information of the jury in giving their verdict, within the meaning of Section 4025, Revised Statutes 1919. The record shows that the defendants filed a written request for a cautionary instruction of this character. But, they did not formulate an instruction on this subject and offer it for the court's approval, although they did formulate and offer several instructions relating to other matters, including their cautionary instructions A and B, above mentioned. Under these circumstances, the court did not commit error in failing or refusing to formulate such an instruction. When confronted with a similar situation, in the case of State v. Starr, 244 Mo. l. c. 182, 183, 148 S. W. l. c. 867, 868, this court said: "On collateral questions it is not the duty of the court to instruct unless the defendant offers an instruction embodying the principle con-

tended for; and, if the instruction as offered is not correct in form, the court should frame and give one in proper form. . . . We now hold that as to collateral questions the parties must formulate and ask such instructions as they may be entitled to, and such instructions should embody the principle for which they contend." This rule was applied, with unqualified approval, in the recent case of State v. Simon, 317 Mo. l. c. 346, 295 S. W. l. c. 1080.

IV. Finally, it is urged that the jury was prejudiced by improper remarks of the prosecuting attorney in his closing argument. The defendants assert, in their motion for a new trial and in their brief, that the prosecuting attorney referred to their failure to testify in this case; that he referred to them as "criminals;" and that he said they ought to be in the penitentiary "where many of their like were." But, our review of the prosecuting attorney's argument discloses that he did not refer, directly or indirectly, to the failure of the defendants to testify, and that, while he did make the other remarks now complained of, no objection was interposed to such remarks at the time they were made. However, in view of the nature of the offense charged and the undisputed evidence of the defendants' guilt, it is our conclusion that the jury was not prejudiced by any of the prosecuting attorney's remarks, although some of his remarks were improper. In this connection, see State v. Harmon, 317 Mo. 354, 296 S. W. 397.

We find no prejudicial error, either in the record proper or the trial proceedings. The judgment entered against each of the defendants is accordingly affirmed. *Davis* and *Cooley, CC.,* concur.

PER CURIAM:—The foregoing opinion by HENWOOD, C., is adopted as the opinion of the court. *Blair, P. J.,* and *White, J.,* concur; *Walker, J.,* absent.