THE STATE v. DAVID A. MILLER, Appellant.—56 S. W. (2d) 92.

.Division Two, December 14, 1932.

*Claude S. Tuttle* and *Osmond Haenssler* for appellant.

*Stratton Shartel*, Attorney-General, for respondent; *Sid C. Roach* of counsel.

676

WESTHUES, C.—On October 26, 1929, the Prosecuting Attorney of St. Charles County filed a verified information in the circuit court, charging appellant in this case and Norman E. Tanner with the crime of murder in the first degree in that they shot and killed one Paulina Duebbert on October 22; 1929. Norman E. Tanner entered a plea of guilty and was sentenced, by the court, to life imprisonment. Appellant was duly arraigned and refusing to plead the court entered a plea of not guilty for him. At the trial, a jury found appellant guilty and assessed his punishment at death. A motion for a new trial was filed, overruled by the court and appellant sentenced. From this sentence an appeal was taken.

We find in the State's brief a fair statement of the case. Omitting a small portion thereof, which we deem argumentative it, reads as follows:

"Paulina Duebbert, deceased, whom defendant is alleged to have shot and killed, was a single person, aged about forty-eight, owned and resided on a farm in St. Charles County. Her hired man August Meyer, who was also shot had been with her continuously on the farm for fourteen years, and only these two resided on the farm. Miss Duebbert was last seen alive doing chores on her farm late of the evening of August 22, 1929. At about midnight of that date a telephone call was received at St. Charles by Doctor L. E. Beld-

ing, a physician, and also Coroner of St. Charles County, from August Meyer, the man on Miss Deubbert's place, that she had been shot and killed and that he was badly wounded: Doctor Belding, the Sheriff and others immediately went to the Duebbert farm, some of the neighbors had 'listened in on the telephone call' and also went over to the Duebbert farm. Upon arrival Doctor Belding and the Sheriff found Meyer in the house and that he had been shot three times with a pistol; they found the dead body of Miss Duebbert in the lot near a fence and straw stack. She had a bullet wound in palm of hand, and had also been shot through the mouth, the bullet coming out at the base of the brain and fired at close range.

"At the trial of the case it was developed that defendant Miller and his co-defendant Tanner, had been engaged in cutting walnut logs on the Duebbert farm a year and a half or two years previous to the killing; that it was generally believed and known to both the defendants that Miss Duebbert kept considerable money about the place, and did no banking business. That Miller had paid her in cash for the logs he cut, and both defendants were familiar with the Duebbert premises and the roads leading there and from; that on the day before the killing, viz., August 21, 1929, Miller and his co-defendant, Norman E. Tanner, left Boonville, Missouri, about 8 A. M., on highway forty, with the avowed purpose of robbing Miss Duebbert. They first drove to St. Charles, put their automobile, which belonged to Miller, in a garage, thence to St. Louis and on to East St. Louis by street car, where they each purchased a pistol and cartridges, Miller buying a nickle-plate Ivers-Johnson .38-caliber, Tanner buying a Bull Dog Pistol .38 caliber. Both of these pistols and some of the cartridges were found later on the Duebbert place, showing to have been recently fired. Miller and Tanner were identified as purchasers, the pistols identified by serial number and record kept by the seller. Miller and Tanner then returned to St. Louis, bought a pair of coveralls each, a pair of canvas gloves each, and several red and blue handkerchiefs, returned to St. Charles, bought a quantity of sandwiches, got their car out of the garage, stopped at Wentzville on highway forty, buying a water jug, and thence they turned off of highway forty and drove by the Chappel road to the Duebbert farm where they remained in hiding all day of August 22, 1929. At about six o'clock they went on a reconoitering trip down to the Duebbert place, got a drink at the well and not seeing anyone, returned the way they had come back to the car, then again approached the house from the rear and observed Miss Duebbert and Mr. Meyer busy about the house doing chores. They then returned to the car, each getting their pistol, Miller taking a flash light, as night by this time was approaching. Upon nearing the place it

was agreed between them that Miller was to hold up Meyer and Tanner was to hold up Miss Duebbert. It appears that upon approaching the place Miss Duebbert was down at the hog lot, while Meyer, a little distance removed, at the barn, so Miller started to the barn for Meyer, and while Tanner started for Miss Duebbert. Just as Miller was reaching the barn he heard Miss Duebbert scream, and immediately Meyer came around the barn and was held up by Miller and directed to march to where Miss Duebbert and Tanner were. Upon the four coming together, both Meyer and Miss Duebbert were directly in front of Miller. It was then noticed by Meyer that Miss Duebbert appeared to have some blood on her face, and it developed in evidence at Coroners inquest she had a bruise or gash on her forehead. Miss Duebbert was screaming—and Miller and Tanner say was striking at Miller with a knife and he, Miller, thereupon shot her dead. Tanner then shot Meyer who fell to his knees. He then shot him twice more. There is no evidence the attempt to rob was carried out. It appears Miller and Tanner after the shooting heard some noise, became alarmed and returned to their automobile in the woods, throwing their guns, coveralls, gloves, handkerchiefs, and flashlight in the woods near their car, and returned to Boonville, arriving there about 1 o'clock A. M., on August 23, 1929. On August 24th Miller and Tanner left Boonville, went to Dayton, Ohio, from there to Richmond, West Virginia, thence to Indianapolis, thence to Pitcher, Oklahoma, and from there Miller came to Buffalo, Missouri, where he was arrested. Tanner was also arrested and both lodged in jail at St. Charles on September 21 or 22. Tanner was the first to make a confession, enter a plea of guilty and given a life sentence. After some questioning Miller made, in the presence of the officers and others, a confession that he and Tanner committed the crime, giving the details substantially as above set forth. However, at the trial Miller repudiated his confession, saying it was brought about by duress . . . Tanner, who voluntarily confessed, was used as a witness at the trial. The statement of Miller and Tanner as to how the crime was committed was corroborated by other evidence in almost, if not every important detail . . .''

Appellant's attorneys have not seen fit to favor us with a brief. We will take the motion for a new trial and dispose of the points therein preserved for our consideration.

■ The first contention made is that appellant was not accorded a preliminary hearing as required by law, therefore, the prosecuting attorney was, under the provisions of Section 3503, Revised Statutes 1929, without authority to file an information in the circuit court. Section 3503, supra, contains a proviso that ''A preliminary examination shall in no case be required where same is waived by

the person charged with crime." In any case where a defendant waives a preliminary hearing such hearing is dispensed with and an information may then be filed in the circuit court. [State v. Piro, 246 S. W. 928; State v. McBride, 12 S. W. (2d) l. c. 48 (6).] In the present case the appellant contends that he did not waive a hearing. The trial court heard evidence on the question and decided that a preliminary hearing had been waived.

The justice of the peace, before whom the complaint had been filed, testified that appellant, on September 30, 1929, appeared before him in the office of the prosecuting attorney. The affidavit, upon which the warrant for the arrest of appellant and Tanner was based, was read to appellant. The officers then attempted to explain with regard to a preliminary hearing and appellant said: "I know all about it, I know what it means; what is the use? I did it." He was then asked: "Well, then, you waive a preliminary hearing? A. Yes, sir." It was also shown that appellant was advised, prior to the time the justice of the peace arrived, that he was entitled to a preliminary hearing. The testimony of the justice of the peace was corroborated by a number of witnesses who were present at the time. The transcript of the justice was also offered in in the evidence, showing that appellant and Tanner had waived a preliminary hearing and that thereafter they were bound over to the circuit court without bond. Appellant denied that he waived a hearing and contended that the prosecuting attorney waived for him without his consent. The finding of the court that appellant waived his hearing was supported by substantial evidence and as we view the record no other finding could have been properly made. The point is ruled against appellant.

■ Appellant also entered a plea of former jeopardy. The evidence taken before the court, on this plea, shows the following to have occurred: On January 27, 1930, appellant was placed on trial. A jury was duly empaneled and sworn and a number of witnesses were called, who testified for the State. At this point a member of the jury became ill. The trial court called Dr. Jenkins to administer medical aid to the juror. Dr. Jenkins reported to the court and testified that the juror was suffering from an acute attack of kidney colic. The sick juror was taken to a hospital in charge of a deputy sheriff while the other eleven jurors were kept together, also in charge of a deputy sheriff, to await further developments. In case the sick juror became able to resume his duties the trial was to proceed. The following day Dr. Jenkins was again called to testify with reference to the condition of the juror. The doctor then stated that in his opinion the juror would be unable to resume his duties in the case. The strain of a long murder trial would be

too great, and in all probability it would be physically impossible for the juror to serve to the end of the trial. Thereupon the trial court made the following order: "On account of the illness of the juror in this case it will be necessary that a mistrial be had and another trial be had of this cause, and the jury may be discharged from further services in this case." Appellant excepted to the ruling of the court. Under these circumstances the trial court properly overruled the plea of former jeopardy.

It is a well-settled rule of law that, when a person is placed on trial and a jury is sworn to try the case, jeopardy attaches. If the trial is discontinued prior to the rendition of the verdict a plea of former jeopardy may be successfully invoked. ■ There are, however, exceptions to this rule, based on common sense and justice, that are recognized by the law and supported by universal authority. Bishop, a recognized authority on criminal law, says: "Sickness may come unknown till it arrives. And if while the cause is on trial it falls on the judge or a juror, or the prisoner, to interrupt the proceeding before verdict, this result shows that no jeopardy existed in fact, though believed to exist, and the prisoner may be required to answer anew." Judge COOLEY, an authority on constitutional law, mentions a number of exceptions and states that: "If by any overruling necessity the jury are discharged without a verdict, which might happen from the sickness or death of the judge holding · the court or of a juror" former jeopardy cannot be successfully invoked. The quotations from Mr. Bishop and Judge COOLEY are taken from the case of State v. Ulrich, 110 Mo. 1. c. 356, 357, 19 S. W. 656. In that case sickness of the trial judge interrupted the trial and at a subsequent trial a plea of former jeopardy was denied and this ruling was sustained by this court. The constitutional protection against double jeopardy was there fully discussed and many cases cited in support of the exceptions mentioned. We find from other states the following later cases wherein sickness of a juror was deemed sufficient reason and an overruling necessity to discharge a jury before rendering a verdict and wherein pleas of former jeopardy were denied. [McCoy v. State, 294 S. W. (Tex.) 573; State v. Kappen, 180 N. W. (Iowa) 307.] [Also Torres v. State, 238 S. W. (Tex.) 928 (death of a brother of a juror); Rittenberry v. State, 117 S. E. (Ga.) 765 (sickness of a juror's wife); Spelce v. State, 103 So. (Ala.) 694 (death of a juror's mother); Salistean v. State, 215 N. W. (Neb.) 107 (sickness of juror's wife and death of child).] The latter case is reported in 53 American Law Reports, 1057, annotations at page 1062. In all of these cases the courts held the causes indicated with the citation sufficient reason and necessity to discharge a jury, and pleas of former jeopardy were denied. If the rule were otherwise

the ends of public justice would often be defeated by some unforeseen event beyond human control. The trial court in this case followed the only course open in discharging the jury and declaring a mistrial. The plea of former jeopardy was properly overruled.

■ Appellant complains of the trial court's ruling in admitting evidence as to admissions, made by appellant, with reference to the commission of the crime charged. Appellant contends that the statements, if any were made, were involuntarily made while appellant was in jail and while under fear or duress. The record does not support appellant's contention. When the matter was first presented to the trial court the jury was excluded and evidence was heard on the question of whether the statements, alleged to have been made, were voluntary or involuntary. The trial court concluded that the evidence of the statements made should be admitted. The court gave a cautionary instruction telling the jury that if the statements attributed to defendant were not voluntarily made then the evidence with reference thereto should be disregarded. The trial court did not err in admitting this evidence. The testimony of the officers and other witnesses, who were friendly to appellant, negatives the use of force or any promise of reward to obtain any admission from appellant. We may add in passing that the evidence of Tanner, a co-defendant of appellant, as to the details of the crime, coincided with the statements attributed to defendant. There was also an abundance of evidence in the record, independent of the admission of appellant and Tanner, pointing directly to their guilt. The evidence leaves no room for any doubt of appellant's guilt.

■ The final contention made is that the trial court erred in not granting appellant a new trial for the reason that one of the jurors, selected to try the case, was related by affinity within the fourth degree to Paulina Duebhert, the party alleged to have been murdered. The juror, therefore, was disqualified by virtue of Section 3668, Revised Statutes 1929. The trial court heard evidence in support of this contention and it developed that juror Henry Hinnah was the husband of Mathilda Duebbert. Mathilda Duebbert was collaterally related to Paulina Duebbert within the seventh degree of consanguinity. The exact relationship may be stated thus: The common ancestor was William Duebbert, who was the great, great grandparent of Mathilda and the great grandparent of Paulina. The juror Hinnah testified that when he was asked the question on the *voir dire* examination, if he was related to any of the parties, he answered in the negative because he did not know of any relationship between his wife and deceased. Hinnah further testified that he had never heard of such a relationship until a few days after the verdict in the case was returned; that his wife did not know

such relationship existed. Hinnah also stated that he knew deceased but had not seen her since his marriage thirty years previous; that he discussed the death of Paulina Duebbert with his wife, but relationship was never thought of or mentioned. There is not a scintilla of evidence in the record to raise any suspicion that the juror knew that any relationship existed between his wife and the deceased.

This question has been before this and other courts on various occasions, resulting in two lines of decisions. The rule followed in Missouri may be found in State v. Stewart, 246 S. W. 936, 296 Mo. 12. The purpose of the statute Section 3668, Revised Statutes 1929, is well stated at pages 939, 940, (3), 246 S. W. as follows:

. ''The clear purpose of Section 4011 is to secure fair and unprejudiced jurors. Knowing human frailties, the Legislature knew that knowledge on the part of a juror of relationship to the defendant or the injured party in a criminal prosecution would make a fair trial exceedingly improbable. While the fact of relationship disqualifies the juror, it is really knowledge of such fact on the part of the juror that may be expected to and in fact does make such juror biased or prejudiced.

''Our conclusion is that the trial court did not err in overruling the contention that a new trial should be granted when the knowledge of such alleged relationship came to the court for the first time after verdict, and, if such relationship actually existed, the juror was not aware of it, and consequently was not influenced thereby.''

In examining cases from other states upon the point in question we find good authority in support of the holding in the Stewart case. It is a universal rule that the relationship of a juror to one of the parties in a law suit disqualifies the juror. The question of whether he is biased or prejudiced is of no concern. In a criminal case the party injured must be considered as a party in interest for the purpose of testing the qualifications of jurors. If, however, it is conclusively shown that a juror, so related, did not learn of such relationship until after a verdict there is no good reason why a new trial should be granted. A juror cannot be prejudiced by a fact unknown to him.

The following cases from other states hold that relationship of a juror to a party in the suit disqualifies such juror, yet if the fact was not known until after verdict a new trial should not be granted [Rogers v. State (Tex.), 3 S. W. (2d) 455; Traviss v. Commonwealth, 106 Pa. 597; Northcutt v. Juett, 36 S. W. (Ky.) 179; Salisbury v. McClaskey, 26 Hun (N. Y.) 262; Miller v. Commonwealth, 262 S. W. 579, 203 Ky. 437; State v. Cooke, 97 S. E. 171, 176 N. C. 731; Hodges v. Bales, 1 N. E. (Ind.) 692.]

. Cases holding that relationship of a juror to a party in interest is ground for a new trial, even though the juror had no knowledge

of the fact, are: Jewell v. Jewell, 24 Atl. (Me.) 858; Bank of University v. Tuck, 33 S. E. (Ga.) 70; State v. Williams, 18 Atl. (Del.) 949. These cases arbitrarily hold that upon the showing of relationship of a juror to a party interested in the suit a new trial should be granted irrespective of whether the fact was known to the juror or not. In the Williams case the Delaware court said:

"By the common law (and we have no statute on the subject) any one related by blood or marriage, as remotely as the ninth degree even, to a party in a trial, is subject to challenge *propter affectum*,—that is, on account of the likelihood or suspicion of bias or prejudice,—and no evidence to the contrary will be heard. The fact constitutes disqualification. It is evident, therefore, that an impartial trial, in contemplation of law in civil cases, cannot be had where such kinship exists, nor by the constitution in criminal cases, treating the victim as in the light of a party."

If the relationship was unknown to all the parties to the suit and also unknown to the juror until after verdict, it is hard to understand how this unknown relationship could have affected the result. As a matter of fact, it could not. It may be said, however, in behalf of this rule, that it operates as a safety valve against the fraud of a juror, who would be so corrupt as to deny relationship, even if known to him, for the purpose of qualifying on the jury panel. On the other hand, the practice of granting a new trial where the relationship is admittedly unknown to all parties to the suit and also unknown to the juror until after verdict, results in an injustice to the successful party. However, trial courts should be very careful in this matter and if there is any suspicion that a juror may have known of the relationship, or became aware of that fact before verdict, a new trial should be granted if not waived by the conduct of the parties adversely affected. Upon a full consideration of this question we are satisfied to adhere to the rule announced in the Stewart case. The point is, therefore, ruled against appellant.

This disposes of all the contentions made in the motion for a new trial. We have carefully examined the record proper and find no error therein. The information, verdict and judgment are in proper form. The appellant was awarded a fair and impartial trial. He was represented by able counsel, who were ever alert to protect his rights. The evidence in the case shows appellant to be guilty beyond doubt. The crime was cruel and atrocious. It is a case where the jury was amply justified in assessing the extreme penalty. The judgment of the trial court must be, and is hereby affirmed. The date of the execution is ordered on and for Friday the 20th day of January, 1933. *Cooley* and *Fitzsimmons, CC.,* concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All of the judges concur.