character, good name, or standing in the community.

It follows that the judgment of the trial court is affirmed as to count 1 and reversed as to counts 2 and 3, and the case is remanded.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

LEEDY, C. J., and DALTON, HOLLINGSWORTH, WESTHUES, EAGER and STORCKMAN, JJ., concur.

HYDE, J., concurs as to Counts 1 and 2; dissents as to count 3 stating a cause of action.

STATE of Missouri, Respondent,

v.

Glenn CHERNICK, Appellant.

No. 44354.

Supreme Court of Missouri.

Division No. 1.

June 13, 1955.

———◆———

·Morris A. Shenker, St. Louis, for appellant.

John M. Dalton, Atty. Gen., John S. Phillips, Asst. Atty. Gen., for respondent.

VAN OSDOL, Commissioner.

Defendant has appealed from a judgment and sentence ·of five years in the state penitentiary upon his conviction of robbery in the first degree by means of a dangerous and deadly weapon, Sections 560.120 and 560.135 RSMo 1949, V.A.M.S. The charge by indictment arose out of events occurring April 24, 1953, at the Southwest Bank situate on the southwest corner of the intersection of Southwest Avenue and Kingshighway Boulevard in St. Louis.

After the trial of the instant case, defendant was tried and convicted of assault with intent to kill with malice aforethought, Section 559.180 RSMo 1949, V.A.M.S., and his punishment was assessed at twenty years in the state penitentiary. Defendant also appealed from the judgment and sentence for assault, and upon review by this court the judgment was reversed and the cause remanded. See State v. Chernick, Mo.Sup., 278 S.W.2d 741.

In the trial of the instant case the evidence introduced was in most respects and in substance like that introduced in the assault case, but we deem it necessary to set out and review the evidence as introduced in the trial of the instant case.

A little after ten in the morning of April 24, 1953, three armed men entered the Southwest Bank. One of them, Fred Bowerman, took a position on a counter near an entrance of the bank building and, armed with a sawed-off shotgun, "covered" the employees and customers and directed the movement of his confederates; another, Frank Vito, carrying a satchel, gathered cash from various tellers' cages; and the other, one William Fred Scholl, crouched in front of a counter and, with pistols, was also covering the Bank's employees and customers. Under the cover and protection and by means of the threats of the use of these dangerous and deadly weapons, Vito took more than $140,000 from drawers of several tellers' cages, including $15,577.77 from the drawer of Cage No. 7 which was in charge of Bank's teller, Alice Ruzicka. . Presently, however, Robert Heitz, a policeman, entered the bank ·through a north (Southwest Avenue side) door and fired his pistol striking Scholl through the back. The noise of Heitz's pistol attracted the attention of Bowerman and Vito who both fired wounding Officer Heitz. But within a very few minutes the bank was surrounded by many policemen. And, although, as stated, Vito had taken large sums .of money from tellers' cages, the three—Bowerman, Vito and Scholl— were unable to escape. Bowerman, forcibly employing a customer as a hostage and shield, attempted ,to escape through the front door and was shot and fatally wounded by Officer Stein; Vito destroyed his own life; and Scholl, wounded by Officer Heitz, surrendered.

It was and is the State's theory that defendant, acting in concert with Bowerman, Vito and Scholl, was constructively present and aiding and abetting by operating a "getaway" car. There was evidence introduced tending to show that a 1951-model Oldsmobile of green color was parked. headed southwardly at the curb in a "no parking" zone on the west side of Kingshighway. At a time when it was seen · that police officers had the bank building entirely surrounded and ·that

Bowerman, Vito and Scholl were entrapped, the driver of this automobile drove away. There was evidence that, at the time, Vito, within the bank, had remarked to Scholl that the "car was gone." It is the State's factual theory that defendant was the driver of the green Oldsmobile.

Defendant urges that the trial court erred in overruling his motion for judgment of acquittal. He says the evidence introduced by the State consisted of isolated circumstances supporting mere possibilities or suspicion, which, in themselves, were insufficient to justify conviction of crime. Defendant-appellant makes other contentions of errors of the trial court, some of which contentions we shall consider after we shall have examined the evidence tending to show defendant's guilt.

There was evidence introduced tending to prove that, April 14, 1953, defendant, using the name of "George Roche," rented two rooms on the third floor of the Ottinger home at 1918 Victor in St. Louis. Defendant and another man (who, it may be inferred, was Vito) occupied the rooms. The two men left the Ottinger home a little after seven in the morning of April 24th. Defendant returned at eleven, and was in the house for not more than ten minutes; and again, about one in the afternoon, defendant returned for a short while. The Ottinger home is about one and one-half blocks from a point on Lemp Avenue where a black Oldsmobile was found on April 25th. It is inferred that this automobile had belonged to Vito.

Witnesses testified that defendant and another came to a sandwich shop situated across Kingshighway from Southwest Bank. This was in the afternoon of April 22nd. Defendant asked directions to Kingshighway and Gravois. Defendant and his companion then walked over to the window facing Kingshighway and engaged in conversation "between themselves." There was also testimony that defendant and Bowerman appeared at a hardware store on Gravois a short distance from the Ottinger home. This, it seems, was in the week prior to the robbery. Defendant asked for a certain type of ammunition. There was no ammunition of that type in the store, and defendant and Bowerman departed.

Myrtle Howard, a Salvation Army collector, was stationed near the front door of the Southwest Bank the morning of April 24th. She learned they were "having a holdup" in the bank. "After they started shooting," a man got out of an automobile parked at the curb. He got out of the passenger side—the side next to the curb. He drew a revolver and pointed it at the witness or at Officer Stein, who had also taken a position near the front door of the bank. When the officers were "coming so fast," the man backed around the hood of the car and momentarily stood on the other side with the gun pointing toward the witness or Officer Stein, and then the man got "in the car and drove off real fast." The man was dressed in a light tan suit and a light overcoat. The automobile was "light on top and kind of a little darker on the bottom, a green."

Richard P. Compton, a salesman, was in the vicinity of Southwest Bank at ten or ten-fifteen in the morning of April 24th. He saw a '51 or '52 Oldsmobile of dark-green color parked in the "no-parking" zone. The witness heard some shots, and saw a man "come around to that car" and speed away. The witness said the man was about the same height as defendant but of somewhat lighter weight. The witness noted the Illinois license number displayed on the green Oldsmobile. This Oldsmobile was found by the police, April 25th, at a point on Northrup within a few blocks of Southwest Bank.

April 26th, a blue Hudson automobile was found parked on Shaw Avenue four or five blocks from Southwest Bank. The Hudson had belonged to one Fredericks, also known as Bowerman.

Casmir Lapski, who was a newspaper vender with station in front of the bank on April 24th, testified that he saw defendant drive a green automobile to a point near the bank. Two other men got out of

the car "near a small park" and went into the bank. Defendant drove on down toward Shenandoah to turn around, and the car was then parked on Kingshighway near Shenandoah about a half block from the bank. The witness further said he saw the car "for the last time when the detectives took the car" away. The witness is Polish, and testified through an interpreter.

Defendant was apprehended in Chicago and was brought to St. Louis in June, 1953. The Circuit Attorney testified that he questioned defendant on June 24 or 25, 1953. Defendant admitted that he was in St. Louis in April, 1953; and that he had known Vito in Chicago, and also saw him in St. Louis. He identified Mrs. Ottinger, and also a Mrs. Cheney who resided with her husband in the Ottinger home. Defendant said, "You know where I know them from as well as I do." Defendant said there was no getaway car at a stated point near the bank, and "there was no woman at any time in this." He also asked, "Could I get ten years if I tell you all about it now?"

■ As we have said in State v. Chernick, supra, wherein evidence of like substantiality was introduced, we are of the opinion that the evidence in its entirety was substantial in tending to show that defendant was present and standing by and in a position to aid his alleged confederates, Bowerman, Vito and Scholl, in perpetrating the robbery at the Southwest Bank, April 24, 1953, and to transport them away from the scene had there been a successful consummation of their plan.

Defendant-appellant further contends the trial court erred in permitting the State's witness, Edward L. Dowd, Circuit Attorney of the City of St. Louis, to testify that he had directed the issuance of an arrest order for the defendant after having questioned William Fred Scholl, a participant in the robbery. Defendant-appellant urges that this evidence was improper, a flagrant violation of the rule against hearsay evidence, and a deprivation of defendant's constitutional right to confront the witnesses against him.

■ In the instant case the name of William Fred Scholl was endorsed on the information, and the Assistant Circuit Attorney stated to the jury in his opening statement that Scholl was expected to testify concerning the activities of defendant "in this holdup" of the Southwest Bank. Defendant requested leave to show that Scholl would not testify, but it would seem the trial court properly relied on the good faith of the Assistant Circuit Attorney. Scholl did not testify, however; and the Circuit Attorney, Mr. Dowd, testified, over objection, that he had questioned Scholl on April 24th or 25th, and that after he had questioned Scholl, "we put an arrest order out for Glenn Chernick." It is thus seen that in the opening statement State's counsel advised the jury that Scholl would testify and implicate defendant and, although the witness did not take the witness stand, nevertheless, a substantial basis for the inference that Scholl had implicated defendant as a participant in the robbery was shown in evidence by the testimony of what the Circuit Attorney did after he had questioned Scholl. Now the same considerations which would have invoked the rule excluding hearsay evidence of the actual assertions of Scholl would forbid that any inference against defendant should be drawn from the conduct of the Circuit Attorney actuated by what Scholl may have said. Of course, the questioning of the wounded Scholl at the hospital by the Circuit Attorney occurred without defendant's presence and when defendant and Bowerman, Vito and Scholl could have been no longer acting together, if so, in the furtherance of the robbery of the Southwest Bank. Their common purpose had been frustrated and their joint action ended— Scholl was hospitalized, Bowerman was fatally wounded, and Vito was dead. Generally it is said that after the common enterprise is ended, whether by accomplishment or abandonment, no one of the conspirators or joint actors is permitted by

any subsequent act or declaration of his own to affect the others. State v. Ross, 29 Mo. 32.

█ The essential principle of the hearsay rule is that for the purpose of securing trustworthiness of testimonial assertions, and of affording the opportunity to test the credit of the witness, such assertions are to be made in court, subject to cross-examination. And, if the declaration of a co-conspirator or co-actor sought to be shown in evidence is not in furtherance of the object of the unlawful combination, or if it was made prior to the formation thereof, or after the consummation of the purpose thereof, the objection to be made is that such declaration is hearsay statement and not binding upon the co-conspirator or co-actor on trial. Vol. 2, Wharton's Criminal Evidence, 11th Ed., § 699, p. 1183, at page 1188; State v. Chernick, supra; State v. Hill, 352 Mo. 895, 179 S.W.2d 712; State v. Priesmeyer, 327 Mo. 335, 37 S.W.2d 425; State v. Buckley, 318 Mo. 17, 298 S.W. 777; State v. Kennedy, 177 Mo. 98, 75 S.W. 979; State v. Duncan, 64 Mo. 262. (Conceptions of the hearsay rule as recognizing the further incidental imprint of trustworthiness because of the oath administered to a witness, and of confrontation and the related constitutional guaranty that in a criminal prosecution the accused shall have the right to meet the witnesses against him "face to face", are also involved. Const. art. I, § 18(a), V.A.M.S; State v. Gorden, 356 Mo. 1010, 204 S.W.2d 713; Vol. V., Wigmore on Evidence, § 1362, pp. 3–7.)

Although in the trial of the instant case defendant's counsel did not appropriately object to the argument of State's counsel relating to the testimony of what the Circuit Attorney, having interviewed Scholl, had done, we quote excerpts from the argument to the jury in which argument the testimony was exploited and driven home by State's counsel to its fullest prejudicial effect.

In his opening argument the Assistant Circuit Attorney urged, "You will recall that he (the Circuit Attorney) said he questioned him (Scholl) approximately three hours, and that was either that day or the next day, and that immediately after questioning Scholl he put out an arrest order for Glenn Chernick. Now naturally none of the details · of that questioning came in, but you will recall the next thing he did, after questioning Scholl. for three hours, was (to) put out an arrest order for Glenn Chernick, * * *." And again in his closing argument the Assistant Circuit Attorney argued, "He (defendant's counsel) said we didn't call—we did not call Mr. Scholl, and of course it's true we did not call Mr. Scholl. At this point the only thing I can say is that Mr. Scholl was also a participant in this holdup, remember that, he is a potential defendant in any respect because he was there at the scene and was actually shot. Let me give you this for consideration. Do you remember Mr. Dowd's statement, 'I questioned Mr. Scholl; I questioned him for two or three hours.' I asked him myself, 'What did you do next, Mr. Dowd?' 'I put out an arrest order for Glenn Chernick.' Remember that. These are all things what happened that you can take into consideration when you are determining whether or not Glenn Chernick was outside that bank. * * *" And again, "I am asking you to consider also in your own minds why Scholl was endorsed as a witness. For what purpose do you think Mr. Scholl was endorsed as a witness in this case? And, number two, why he didn't testify. Remember Mr. Dowd's testimony was that after talking with Scholl he immediately put out an arrest order for the defendant, Glenn Chernick. You are entitled to consider all those things."

We hold the trial court's action in overruling the objection to the testimony of what the Circuit Attorney did after he questioned Scholl was prejudicially erroneous. State v. Chernick, supra.

Defendant-appellant in the instant case, as in the assault case, State v. Chernick, supra, contends errors in instructing the jury and in unduly circumscribing defend-

ant's evidence during voir dire, on the preliminary questions of the "voluntariness" and admissibility of defendant's statements to the Circuit Attorney. These contentions may be studied by counsel and all grounds therefore avoided upon retrial. Other questioned incidents occurring during the trial and argument may not recur.

The judgment should be reversed and the cause remanded.

It is so ordered.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

All of the Judges concur.