**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Arondo IRVING, Defendant-Appellant.**

No. 38117.

Missouri Court of Appeals,
St. Louis District,
Division Four.

Nov. 15, 1977.

William Shaw, Public Defender, Dennis N. Smith, Asst. Public Defender, St. Louis, for defendant-appellant.

John D. Ashcroft, Atty. Gen., Paul Robert Otto, Asst. Atty. Gen., Jefferson City, Courtney Goodman, Jr., Pros. Atty., Richard S. McConnell, Asst. Pros. Atty., Clayton, for plaintiff-respondent.

SIMEONE, Chief Judge.

I.

This case may be referred to as the "triple jeopardy case."

This is an appeal by the defendant-appellant, Arondo Irving (sometimes referred to as Ron), from a judgment of conviction entered on April 29, 1976 by the circuit court of St. Louis County wherein the defendant was sentenced upon a jury verdict to a term of six months in the custody of the St. Louis County Department of Welfare for the offense of stealing a motor vehicle in violation of § 560.161, subsection 2, RSMo Supp.1975. He appealed. We reverse the judgment and discharge the defendant.

The defendant-appellant does not question the sufficiency of the evidence to make

a submissible case. Appellant's only point is that the trial court erred in overruling his motion to dismiss the case prior to the start of a third trial for the reason that he had been placed in jeopardy previously for the same crime and that any further proceedings were barred by the United States and Missouri Constitutions. U.S.Const., Amend. V and XIV; Mo.Const., Art. I, Sec. 19.

## II.

The facts giving rise to the conviction are as follows.

On July 4, 1975, John Lawrence Winston, age 30, attended a party at a friend's house at the Village Apartments in Ferguson, Missouri. The next day, July 5, 1975, at about 2:15 p. m. he returned to the apartment complex to recover his glasses which he thought he had lost there the night before. He drove his 1971 black Chevrolet Camaro to the apartment complex and parked it on a nearby parking lot. When Winston got out of his automobile he thought he would be gone a very short time and left his keys in the ignition. On the way to the friend's apartment he was "confronted by someone across the street and just got into a casual conversation." About twenty minutes later he returned to the place where he parked his car. The car was gone. He had not given anyone permission to take the car. Upon discovering that the vehicle was missing he called the Ferguson police and an officer came out to take a statement. The automobile was eventually recovered in Brooklyn, Illinois. When it was recovered there were "several small things wrong such as . . . the gearshift lever, . . . the light switch . . [and] a tear in the headliner . . . ." The license plates on the automobile were not Winston's. Papers and the registration (pink slip) were also missing.

On July 8, 1975, Detective Edward Robertson and his partner Detective Donald Bortz had a conversation with the appellant, Irving, after advising him of his *Miranda* rights, concerning the theft of the vehicle at the police department. Detective Robertson earlier met appellant at his home and advised him he would "like to talk to him in reference to a theft that had occurred in Ferguson on Saturday." They went to the police station. Irving was quite cooperative. At the station he made two oral statements and one written one. The thrust of these statements was that the appellant, on July 5, 1975, drove to the apartment complex with Earl Ganaway, Christine James and Harold Bradshaw. The purpose of the trip was to take Ganaway there. Appellant parked alongside the Camaro. Bradshaw noticed the keys in the Winston automobile, said he was going to "snatch" it and, according to Detective Robertson, made arrangements between himself and Irving to meet each other later on Wells Avenue in the City. The statement of appellant indicated that he drove his car to Earl Ganaway's mother's house in Ferguson together with Christine James and Harold Bradshaw. Bradshaw noticed some keys in the car and drove the vehicle away. Bradshaw asked appellant to meet him at Wells and Stewart where "they" changed plates. Later at Christine James' house Irving's statement was that "we took the plates off of my car and put them on the Camaro." But later appellant became afraid "and took my plates off the Camaro and put them back on my car."[1]

On October 20, 1975, appellant was charged by information with stealing the Winston vehicle. Trial began on January 27, 1976 in the circuit court of St. Louis County. After the jury was empaneled and sworn and preliminary instructions read, the prosecutor made an opening statement. During the opening statement the prosecutor stated:

"[Prosecutor]:

. . . . .

1. The appellant's version differed. In his testimony he stated that he gave his plates to Bradshaw to put on his [Bradshaw's] car and when he found out they were on the Camaro he took them off. He also testified that he made a strong effort to have the car returned to Winston by notifying several individuals. Bradshaw asked appellant to meet him at Wells and Stewart. Bradshaw put license plates on the Camaro which were later learned to be stolen.

At the Ferguson Police Department Detective Robertson will testify that he interviewed Miss James. And he will tell you her version of the story indicates that the defendant was present, but that another person who was present took the car. And that the defendant and this other person met later after the car was stolen, that the defendant put his license plates on the stolen car and that she was with the defendant—"

The defense attorney objected "to this form of opening statement" because "he is talking about hearsay testimony at this point, and it would be inadmissible at trial . . . ." Defense counsel did not, however, move for a mistrial. After a short colloquy the court said, "That's hearsay. Wouldn't that be hearsay?" The prosecutor replied, "If objected to I think it would be hearsay." At that point the court, without a request and in the presence of the jury, declared a mistrial:

"THE COURT: Members of the jury, I am going to declare a mistrial. What [the prosecutor] told you is hearsay. And if objected to during the trial, as I think it could have been anticipated, it would be wholly improper to get before a jury. This is hearsay. It's the unsworn statement of somebody made to somebody else outside the courtroom.

So that terminates your services in the case. . . ."

Later that same day a new jury was empaneled. During this second trial and during the reading of MAI–CR 1.02, defense counsel asked leave to approach the bench and informed the judge that

". . . it's my feeling that since a mistrial was declared after the jury had been sworn that my client has been placed in jeopardy and, therefore, . . . I would move that he be discharged and the case be dismissed at this time."

The court overruled the motion and continued reading MAI–CR 1.02. At the completion of the voir dire examination, defense counsel again moved to dismiss the case ". . . for the reason of double jeopardy. . . . And I would like to make the motion prior to the jury being sworn in and indicate on the record at this time that I am proceeding to trial with this case, but I wish in no way to waive that objection."

This second trial proceeded. The first witness, John Lawrence Winston, testified. The second witness to testify for the State was Detective Robertson. During his testimony the prosecutor asked:

"Q. [Prosecutor]: Do you recall the conversation that took place then?

A. [Detective Robertson]: Yes. Well, I did not talk to Mr. Irving first. I talked to Miss James first and then I came back and talked to Mr. Irving after advising him his rights. He stated that on the date the automobile was stolen he had driven a subject by the name of Ganaway, Miss James, Mr. Bradshaw—"

At that point defense counsel objected on the grounds of hearsay. The court overruled the objection. The detective then related the conversation he had with appellant in which Irving stated that Bradshaw "took the car and he had not seen him since." The prosecutor then asked if the Detective had a conversation with Christine James. The Detective replied that he had. The prosecutor then asked, "Would you relate to the Court the conversation you had with her." An objection was made by defense counsel and sustained. The very next question by the prosecutor was: "After your conversation with *Detective Bortz* what then took place?" (emphasis added). The answer was: "Mr. Irving was placed under arrest for suspicion of auto theft." At that point defense counsel approached the bench and moved for a mistrial.

"[Defense Counsel] . . . Once again [the prosecutor] is interjecting this theory of what *Miss James* said at the time to the police at the police station. Now, he has left the inference in the jury's mind that *she* said something implicates [sic] Arondo Irving in the crime. . . ." (emphasis added).

Out of the hearing of the jury the following occurred:

"THE COURT: On the record. We had a situation that occurred this morning, and I think the record ought to show it. We had one jury and in the opening statement counsel for the state told the jury about *what this woman said to the police* by way of hearsay, which would implicate or tend to implicate the defendant. Is that right, gentlemen? (emphasis added).

[Defense Counsel]: Yes, your Honor.

THE COURT: I declared a mistrial on motion of the defendant because of this hearsay statement.

[Defense Counsel]: Your Honor, . . I did not move for a mistrial this morning. I merely objected to the evidence at that time.

THE COURT: Well, what difference does it make?

. . . . .

THE COURT: I declared the mistrial.

. . .

. . . . .

THE COURT: . . . I thought you [defense counsel] moved for a mistrial.

. . . . .

[Defense Counsel]: No, I didn't. I don't believe I did, your Honor.

THE COURT: Well, it doesn't make any difference in my opinion. I think the Court has authority on its own motion to declare a mistrial. . . ."

After the prosecutor attempted to explain his position, the court stated:

"THE COURT: . . . I say that, as far as I am concerned, whether a question is asked like that . . . it's a very questionable practice; no matter what the circumstances are that you have detailed to me, whether you thought [defense counsel] wanted it in or not, whether the witness you thought would be called or not. . . .

Now we come to the second point. After getting an objection sustained to the question *you say then,* the next question

comes after talking *to this woman, then you arrested the defendant.*[2] The very plain implication is that this woman told you something or told the police something that implicated the defendant, which of course is hearsay.

Now, I am going to have a recess now, and I want to look up some law about it. . . ." (emphasis added).

The court then recessed until the following day. Out of the presence of the jury the trial judge stated that he checked the law,

". . . particularly the case of the State against Chernick, in 280 SW 2nd. I feel that a prejudicial statement has been made or some testimony has come out before the jury under the *Chernick* case and that it would be unfair to the defendant and would prejudice his constitutional rights if we proceed with a trial.

How do you feel about it, [defense counsel]? . . . "

Defense counsel withdrew his earlier motion for a mistrial stating, " . . . I really don't want a mistrial." After further colloquy the court stated:

"THE COURT: You know, the Judge has a little bit of responsibility to the defendant and to the state and to the people to see that the defendant gets a fair trial. And if you don't move for a mistrial I think that I have power to declare one because I think something prejudicially erroneous has been committed, and it's my duty to remove it."

Defense counsel then informed the court that

". . . we have a jury right now that I think is very highly favorable to our side. I think we had a good voir dire and I would very much like this jury to decide the case. Now, I agree with the Court that prejudicial error has been committed, but I think it's only fair to the defense . . . that we continue with this trial. . . . [I]f we allow a mistrial in this situation every time we get a jury in the box that is favorable to the

---

2. The actual question was: "Q. After your conversation with *Detective Bortz* what then took place?" "A. Mr. Irving was placed under arrest for suspicion of auto theft."

defendant, . . . then the state can come out with something that would be prejudicial and there would be a mistrial."

The court then found that the prosecutor acted in good faith " . . . because there was some confusion about whether this woman [Christine James] was going to be put on the stand or not."

After defense counsel again stressed the point that he did not want a mistrial, the trial court on its own motion declared a mistrial "for the reason that I have stated," and the jury was discharged.

On January 28, 1976, a new jury panel was called for. Prior to any of the trial proceedings, defense counsel moved to dismiss the case on the ground of double jeopardy.[3] This third trial proceeded and the above facts were elicited. The jury found the defendant guilty and assessed his punishment at six months in the county jail. After a motion for new trial was filed and allocution granted, the court sentenced the defendant in accordance with the verdict. Defendant duly appealed.

### III.

On this appeal appellant makes one point. He contends that the trial court erred in overruling his motion to dismiss the proceedings prior to the beginning of the third trial for the reason that appellant had been placed in jeopardy for the same crime and that any further proceedings were barred by the Fifth and Fourteenth Amendments of the United States Constitution and by Article I, Section 19, of the Missouri Constitution.

He argues that jeopardy attaches when the jury is sworn and that a mistrial was declared by the trial court *sua sponte* and not at the request of appellant, and in effect under the circumstances the defendant has been placed in jeopardy in the first two trials so that he should be discharged.

The State on the other hand contends that the trial court did not err in overruling the motion to dismiss prior to the beginning of the third trial because the trial court reasonably believed that it was "manifestly necessary" to order a mistrial in both prior proceedings.

### IV.

The issues presented in this case are of an "elusive nature." They are not easily resolved. No hard and fast principles can be laid down.

The issues, as we perceive them, are whether in the first trial there was "manifest necessity" for the court to declare a mistrial *sua sponte* during the opening statement and whether in the second trial a mistrial should have been declared against the express wishes of the defense so as to permit a reprosecution of the appellant in the third trial.

 The Fifth Amendment of the United States Constitution made applicable to the states, *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), represents fundamental policy considerations. It provides that "[n]o person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb. . . . " The concept of "Double Jeopardy" is very old.[4] The Constitution of Mis-

---

**3.** "[Defense Counsel]: Your Honor, once again I make a motion to dismiss this case. I feel the defendant has once been placed in jeopardy once again through actions by the prosecuting attorney, whether intentional or unintentional. . . . I withdrew my motion for a mistrial. I stated to the Court that I wanted to continue with the trial. . . .

THE COURT: There is no jeopardy. The man's guilt or innocence has never been put in issue for determination.

As I understand the law in Missouri, there is no jeopardy when there has been a mistrial declared.

Well, I have already ruled on it.

[Defense Counsel]: I disagree with that, but we can take it up later."

**4.** For a full discussion of the concept and history of the Double Jeopardy Clause see *United States v. Wilson*, 420 U.S. 332, 95 S.Ct. 1013, 1020–1023, 43 L.Ed.2d 232 (1975); *Bartkus v. Illinois*, 359 U.S. 121, 79 S.Ct. 676, 695–697, 3 L.Ed.2d 684 (1959)—(Black, J., dissenting); *United States v. Jenkins*, 490 F.2d 868, 870–873

souri, Article I, Section 19, provides that " . . . nor shall any person be put again in jeopardy of life or liberty for the same offense, after being once acquitted by a jury. . . . "[5] While there are many protections underlying the Double Jeopardy Clause[6], the constitutional prohibition represents a "constitutional policy of finality" for the defendant's benefit in criminal proceedings. The power of government to subject an individual to repeated prosecutions for the same offense

" . . . would cut deeply into the framework of procedural protections which the Constitution establishes for the conduct of a criminal trial. And society's awareness of the heavy personal strain which a criminal trial represents for the individual defendant is manifested in the willingness to limit the Government to a single criminal proceeding to vindicate its very vital interest in enforcement of criminal laws." *United States v. Jorn,* 400 U.S. 470, 91 S.Ct. 547, 554, 27 L.Ed.2d 543 (1971).

There are certain well-recognized principles governing the concept of "Double Jeopardy."

1. The Double Jeopardy prohibitory rule is applicable to a criminal proceeding once the defendant is put to trial before the trier of facts whether the trier be a jury or a judge. In jury trials the defendant in a criminal case is placed in "jeopardy" when, upon a valid indictment or information, the jury has been empaneled and sworn. *State v. Snyder,* 98 Mo. 555, 12 S.W. 369, 370 (1889); *State v. Miller,* 331 Mo. 675, 56 S.W.2d 92, 95 (Mo.1932); *Durham v. State,* 538 S.W.2d 881, 883 (Mo.App. 1975).

2. Normally, the Double Jeopardy claim does not arise when a mistrial is declared upon the defendant's request.[7] But even where there is a request, there are circumstances where a defendant's mistrial request does not remove the Double Jeopardy bar. The Clause protects a defendant against governmental actions intended to provoke a mistrial request. It bars retrials where the underlying error is motivated by bad faith or undertaken to harass or prejudice the defendant. *Dinitz,* 96 S.Ct. at 1081–1082; *Martin,* supra.

3. The Double Jeopardy provision is not applicable to all circumstances. The provision

"does not mean that every time a defendant is put to trial before a competent tribunal he is entitled to go free if the trial fails to end in a final judgment. Such a rule would create an insuperable obstacle to the administration of justice in many cases in which there is no semblance of the type of oppressive practices at which the double-jeopardy prohibition is aimed. There may be unforseeable circumstances that arise during a trial making its completion impossible . . . In such event the purpose of law to protect society from those guilty of crimes frequently would be frustrated by deny-

---

(2d Cir. 1973), aff'd, 420 U.S. 358, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975); *Green v. United States,* 355 U.S. 184, 78 S.Ct. 221, 223–224, 2 L.Ed.2d 199, 61 A.L.R.2d 1119 (1957).

**5.** Although the language of the constitution is restrictive it must be construed to comport with the principles of the United States Constitution as made applicable to the states. There is no readily discernable difference between the Fifth Amendment guarantee against double jeopardy and the common law guarantee as applied in this State. *State v. Aguilar,* 478 S.W.2d 351, 354 (Mo.1972).

**6.** "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against

multiple punishments for the same offense." *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969).

**7.** The claim of Double Jeopardy does not arise when the mistrial is declared at defendant's own motion, *Madison v. State,* 533 S.W.2d 252, 255 (Mo.App.1976). See also *United States v. Dinitz,* 424 U.S. 600, 96 S.Ct. 1075, 1080, 47 L.Ed.2d 267 (1976) and *Lee v. United States,* 432 U.S. 23, 97 S.Ct. 2141, 2147–2148, 53 L.Ed.2d 80 (1977). The Double Jeopardy Clause generally does not stand in the way of a reprosecution where defendant has requested a mistrial. *United States v. Martin,* 8th Cir., 561 F.2d 135 (1977).

ing courts power to put the defendant to trial again. . . . " *Wade v. Hunter,* 336 U.S. 684, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949).

■ 4. The trial court, vested with discretion, has the authority to discharge a jury from giving any verdict when, under all the circumstances, there is a "manifest necessity" to abort the trial, so that the defendant may be retried without violating the Double Jeopardy prohibitory rule. In this regard the courts have not laid down an inflexible, rigid test as to when trials may be discontinued by a trial court *sua sponte* so that the constitutional prohibition is applicable to a subsequent trial. A mechanical rule has never been applied nor can one be devised. Rather, the guiding principle, and the fount of all discussion, is *United States v. Perez,* 22 U.S. 579 (9 Wheat.), 6 L.Ed. 165 (1824). There, in a capital case where the jury was unable to agree upon a verdict and was discharged, Mr. Justice Story stated for the Court:

" . . . We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; . . . Courts should be extremely careful how they interfere with any of the chances of life, [or liberty] in favour of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office." *Perez,* 22 U.S. at 580.

Under this flexible rule of "manifest necessity" or "the ends of public justice," numerous decisions both in the federal and state courts have held that a reprosecution is not barred where a mistrial has been declared without the defendant's request therefor.[8]

The decisions, of course, depend upon particular facts. While it is not possible to set forth a principle governing all of the cases, a distillation of the authorities shows that "manifest necessity" is applicable either when there is an obvious procedural error in the trial which would, on appeal, make reversal a certainty or when there is a breakdown in the judicial machinery. See *Somerville,* 93 S.Ct. at 1070; Note, Double Jeopardy: The Reprosecution Problem, 77 Harv. L.Rev. 1272, 1277 (1964).

While most decisions have held that the trial court acted in the exercise of sound discretion in aborting an earlier trial and that reprosecution may proceed without violating the Double Jeopardy provision, certain factual situations have been held not to rise to the high level of "manifest necessity" so as to permit a reprosecution of the

---

**8.** *Simmons v. United States,* 142 U.S. 148, 12 S.Ct. 171, 35 L.Ed. 968 (1891)—retrial not barred where mistrial granted because letter published in newspaper rendered juror's impartiality doubtful; *Wade,* 69 S.Ct. 834—retrial not barred where military court martial gave new trial because of the tactical situation in the field; *Logan v. United States,* 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429 (1892)—retrial not barred when jury was discharged after 40 hours deliberation; *Thompson v. United States,* 155 U.S. 271, 15 S.Ct. 73, 39 L.Ed. 146 (1894)—retrial not barred when one juror had served on indicting grand jury; *Illinois v. Somerville,* 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973) —defective indictment; *Gori v. United States,* 367 U.S. 364, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961)—appearance to judge that prosecutor's questions might lead to introduction of evidence of prior crimes; *Parker v. United States,* 507 F.2d 587 (8th Cir. 1974), *cert. den.* 421 U.S. 916, 95 S.Ct. 1576, 43 L.Ed.2d 782 (1975)—juror heard radio report that prosecution witness had been threatened; *Lovato v. New Mexico,* 242 U.S. 199, 37 S.Ct. 107, 61 L.Ed. 244 (1916) —no plea to indictment; Anno., 6 L.Ed.2d 1510 (1962); 85 A.L.R.2d 486 (1962); *State v. Tippett,* 538 S.W.2d 756 (Mo.App.1976)—juror advised court that she knew defendant—good discussion; *Miller,* 56 S.W.2d 92—sickness of key participant in trial; *Aguilar,* 478 S.W.2d 351— improper questions by defense counsel.

defendant. In *Jorn,* 91 S.Ct. 547, a mistrial was declared by the trial judge on its own motion when the judge concluded that taxpayers who had been called as government witnesses in the trial of defendant had not been properly advised of their rights against self-incrimination. The Supreme Court of the United States held that reprosecution of the defendant violated the Double Jeopardy provision of the Fifth Amendment. The trial judge in *Jorn* acted abruptly, discharged the jury and did not allow consideration of other alternatives.

In the course of the opinion, the court also disapproved of the principle established in *Gori,* 81 S.Ct. 1523, relied upon by the respondent. In *Gori* the reprosecution of the defendant was upheld after a mistrial and no abuse of discretion was found when the judge was acting in the sole interest of the defendant. In *Jorn,* 91 S.Ct. at 556, the Court held that the benefit to the defendant test enunciated in *Gori* " . . . does not adequately satisfy the policies underpinning the double jeopardy provision." When the judge acts without the defendant's consent and aborts the proceedings, the defendant has been deprived of the valued right to have his trial completed by a particular tribunal. Hence, in the absence of a request,

> " . . . the *Perez* doctrine of manifest necessity stands as a command to trial judges not to foreclose the defendant's option until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings." *Jorn,* 91 S.Ct. at 557.[9]

Applying these principles to this appeal, we hold that the trial court erred in not granting the defendant's motion to dismiss the proceedings at the beginning of the third trial.

 In the first trial against the appellant, which was aborted, the trial court, without a request for a mistrial, declared a

mistrial on the grounds that the prosecutor indicated that hearsay evidence would be used. The prosecutor's statement did not constitute evidence and the statement was objected to. The court made clear in Instruction No. 2 (MAI–CR 2.02) that the opening statements of the attorneys are not evidence. When an objection to improper statements to the jury has been made and no further relief is sought, the courts have maintained confidence that the jury will be guided by admissible evidence. At this early stage of the proceeding there were other possible alternatives available to the trial court to correct the situation other than the drastic remedy of aborting the trial. *Cf. Jorn,* 91 S.Ct. at 558. The power of a trial court to declare a mistrial must be exercised with the greatest caution, only under urgent circumstances and only for very plain and obvious reasons. As *Perez* teaches, courts must be extremely careful how they interfere. Since the court acted abruptly, without request and at a time when there were other possible alternatives to correct any error, and aborted the trial, we are compelled to conclude that aborting the trial at this early stage did not rise to the level of "manifest necessity" within the meaning of the principles set forth above.

As to the second proceeding, the trial court and apparently counsel for the defense as well as appellate counsel here are all under the impression that prejudicial error was injected because Detective Robertson had testified that after his conversation with *Miss James* he immediately arrested the appellant—all in direct violation of *State v. Chernick,* 280 S.W.2d 56 (Mo. 1955). As a matter of fact, however, the objection to the question of the prosecutor to Detective Robertson to relate the conversation he had with Miss James was sustained. Detective Robertson then testified that he placed the appellant under arrest after he had a conversation with *Detective Bortz,* not Miss James. It was thereafter that lengthy discussions were had concern-

**9.** "Yet, in the final analysis, the judge must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate." *Jorn,* 91 S.Ct. at 558.

ing the impropriety of interjecting the arrest after talking to "this woman," and was on that basis that the trial judge granted a mistrial on the basis of *Chernick.*

In *Chernick* our Supreme Court reversed the convictions because the circuit attorney was permitted to testify that immediately after he had questioned one of the participants in the crime he directed the issuance of an arrest order for the defendant. The court held this to be prejudicial error. See also *State v. Kirkland,* 471 S.W.2d 191 (Mo. 1971). But these cases have been distinguished from the situation where hearsay testimony was heavily relied upon by the State to identify the defendant and in which there was very little, if any, other evidence which connected the defendant with the offense. See *State v. Stevens,* 467 S.W.2d 10, 21–22, 50 A.L.R.3d 96 (Mo.1971), *cert. den. sub nom. Stevens v. Missouri,* 404 U.S. 994, 92 S.Ct. 531, 30 L.Ed.2d 546; and *State v. Harris,* 535 S.W.2d 145, 149 (Mo. App.1976).

Assuming, as did apparently the trial court and counsel, that *Chernick* was directly applicable to the situation relative to the questions of the prosecutor that the appellant was arrested after Robertson's conversation with *Miss James,* the action of the trial court in aborting this second proceeding must be balanced by the wishes and desires of the defendant to proceed to have his trial completed by a particular tribunal. The right to be tried before a particular tribunal is a "valued right." The defendant has a significant interest in the decision whether or not to take the case from the jury when circumstances occur which might be thought to warrant a mistrial. *Jorn,* 91 S.Ct. at 557; *Dinitz,* 96 S.Ct. at 1080. "The important consideration, for purposes of the Double Jeopardy Clause, is that the defend-

ant retains primary control over the course to be followed in the event of such error." *Dinitz,* 96 S.Ct. at 1081.[10] The mistrial in the second aborted proceeding was granted over the specific objections of defense counsel. The defendant had a valued right to proceed with the selected jury. We therefore believe under all the circumstances that the trial court erred in aborting the second trial.

While a trial court is vested with broad discretion in declaring a mistrial because of "manifest necessity" and while we normally defer to that discretion, in this case, applying all these considerations to this complex and difficult cause, we are compelled to conclude that the trial court erred in overruling appellant's motion to dismiss the third proceeding. Since the defendant was placed in jeopardy, the judgment of conviction must be reversed and the defendant discharged.

We have read the total transcript; we have studied the briefs of the parties and all of the authorities cited therein. We have done our own independent research and conclude that, under these unique circumstances, the judgment should be reversed.

The judgment is reversed and the defendant discharged.

ALDEN A. STOCKARD and NORWIN D. HOUSER, Special Judges, concur.

---

**10.** In *Scott v. Municipal Court of Beverly Hills Jud. Dist.,* 17 Cal.App.3d 885, 95 Cal.Rptr. 460, 462 (1971), the California court, quoting from *Curry v. Superior Court,* 2 Cal.3d 707, 87 Cal. Rptr. 361, 470 P.2d 345 (1970) stated:

" 'A defendant may choose not to move for or consent to a mistrial for many reasons. . . . Indeed, even when a palpably prejudicial error has been committed a defendant may have valid personal reasons to prefer

going ahead with the trial rather than beginning the process anew, such as a desire to minimize the embarrassment, expense, and anxiety mentioned above. These considerations are peculiarly within the knowledge of the defendant, not the judge, and the latter must avoid depriving the defendant of his constitutionally protected freedom of choice in the name of a paternalistic concern for his welfare.' "