**STATE of Missouri, Respondent,**

v.

**Hansford GASKIN, Appellant.**

**No. 61433.**

Supreme Court of Missouri,
Division No. 2.

July 14, 1981.

Rehearing Denied July 29, 1981.

Cynthia S. Holmes, Sp. Asst. to the Public Defender 22nd Judicial Circuit, St. Louis, for appellant.

John Ashcroft, Atty. Gen., S. Francis Baldwin, Asst. Atty. Gen., Jefferson City, for respondent.

STOCKARD, Commissioner.

Hansford Gaskin[1] was found guilty by a jury of robbery, first degree; armed criminal action based on the use of a dangerous and deadly weapon in the commission of the robbery; and assault with intent to kill with malice aforethought. The court imposed a sentence of life imprisonment for robbery, and a sentence of three years for armed criminal action, the sentences to run consecutively. It also imposed a sentence of life imprisonment for the assault to be served consecutively with the previous two sentences.

Appellant does not challenge the sufficiency of the evidence as to any of the charges. It is sufficient to state that a jury reasonably could find from the evidence that on November 10, 1976, by use of a pistol, appellant took from Dennis Purdy a pouch containing some money and some papers, and then as Mr. Purdy attempted to leave, appellant shot him in the back of the neck with the pistol.

By his first point appellant contends the court erred in admitting "testimony concerning line-up identification * * * and in Court identification" because, as he asserts, (a) the line-up identifications were conducted without counsel, (b) were unduly suggestive, (c) were tainted by prior unduly suggestive photograph displays, and (d) the in-court identification was not based on sufficient independent recollection to overcome said undue suggestion.

On November 10, 1976, Roosevelt Manuel was in his store located at 914 Academy in the City of St. Louis, and with him were Dennis Purdy, the victim of the robbery and assault; Joseph Purdy, his father; and Silas Hardiman, a police officer not in uniform. A person, subsequently identified as appellant, entered the store, spoke to Dennis Purdy, and the two left the store. A few minutes later, Dennis Purdy re-entered the store, fell to the floor, and stated that he had been shot. Officer Hardiman ran from the store and searched the neighborhood for the assailant, but did not find him. At trial he identified appellant, without objection, as the person who entered the store, spoke to Dennis Purdy, and then left with him. About a year after the assault and robbery two police officers arrested Roosevelt Manuel for an assault which was unrelated to the incident on November 10, 1976. While Manuel was at the police station he identified a photograph of appellant. According to Manuel he was casually looking at some photographs on the wall, and Officer Nash asked him if he recognized anyone in those photographs. Manuel referred to

---

1. This is the spelling of appellant's name on the notice of appeal. Counsel states the correct spelling is Hanford Gaskin.

the photograph of appellant and said, "[t]hat's the person that came in and got Dennis Purdy the night he got shot." Officer Nash testified he had been conducting an investigation as to the whereabouts of appellant who was wanted for murder and for flourishing a deadly weapon, but that at that time he had no knowledge of the shooting incident at Manuel's store. Officer Nash stated that when he noticed that Manuel was looking at photographs on the wall, he pointed to the photograph of appellant and asked him if he had "seen this guy in the neighborhood?" Manuel replied, "[t]hat's the guy that shot Dennis Purdy * * *." On the following day Officer Nash and another officer went to the home of Dennis Purdy and showed him four photographs. He "tentatively" identified the photograph of appellant, and he stated that the photograph showed a long, heavy scar but he was not certain that the person who robbed him had such a scar because the robber wore a knit cap which covered part of his head. About two weeks later appellant was placed in a lineup and Dennis Purdy identified appellant in that lineup as the person who robbed him. Appellant was later placed in another lineup and Roosevelt Manuel identified appellant. At trial Dennis Purdy testified that appellant was the person who robbed him and Roosevelt Manuel testified that appellant was the person who came into his store and then left with Dennis Purdy.

◼ At the time appellant was placed in a lineup he had not been charged by indictment or information with any of the offenses for which he was tried. The exclusionary rule mandated by *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) applies only to post indictment-information lineups and not to lineups conducted prior to the commencement of formal criminal prosecution. *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972); *State v. Quinn,* 594 S.W.2d 599 (Mo.

banc 1979). There is no merit to appellant's contention that the lineup identification was improper because appellant did not have counsel present.

◼ Appellant's next contention, that the lineups were "unduly suggestive," is equally without merit. The trial court found the lineups not to have been unduly suggestive, and on review we are limited to a determination of whether the evidence was sufficient to sustain the trial court's finding. *State v. Duncan,* 540 S.W.2d 130 (Mo.App. 1976); *State v. Tippett,* 588 S.W.2d 742 (Mo.App.1979). A photograph of each lineup was introduced in evidence, but neither exhibit has been lodged with this Court. Appellant makes no effort to demonstrate why the lineups are claimed to have been suggestive. The record shows that at no time did the police officers indicate to Manuel or to Dennis Purdy who should be identified in the lineup. There is nothing in the record to indicate that by reason of the composition of the lineups or because of the manner in which they were conducted either lineup was suggestive.

◼ Next, appellant asserts that the lineups were "tainted" by "prior unduly suggestive photograph displays." This is not borne out by the record. At most the record shows, as Manuel testified, that he saw a photograph of appellant on the wall with photographs of other persons and he identified that person as the one who came into his store, or as Officer Nash testified, that when asked if he had seen appellant in the neighborhood, Manuel volunteered the information that he was the one who "shot Dennis Purdy." Four photographs were shown to Dennis Purdy, and he identified one as being a photograph of the person who had shot him. The four photographs were introduced in evidence and the trial court viewed them, but they have not been filed in this Court. We find nothing in the record to indicate that there was anything suggestive in the use of these photographs.

◼ The final contention is that the in-court identifications were not based on

"sufficient independent recollection to overcome said undue suggestion." First, we find no "undue suggestion" or improper identification procedure. Dennis Purdy had a face-to-face encounter with appellant and talked to him. He certainly had an adequate opportunity to form an impression of his features. Mr. Manuel saw him enter his store, talk to Dennis Purdy and leave. He also testified that he had seen him frequently in the neighborhood. This contention is totally without merit.

Appellant's second point is that the trial court erred in admitting into evidence the leather coat, which was worn by Dennis Purdy when he was shot and which contained a bullet hole in the collar, because it was "not disclosed" as required by Rule 25.03(A)(6) and thus constituted "unfair surprise."

Rule 25.03(A) provides that "[e]xcept as otherwise provided in these Rules as to protective orders, the state shall, upon written request of defendant's counsel, disclose to defendant's counsel such part or all of the following material and information within its possession or control designated in said request: * * * (6) Any * * * objects, which the state intends to introduce into evidence at the * * * trial * * *."

At the time the coat was offered in evidence appellant's counsel objected because it had "never been disclosed to the defendant as a part of his request for discovery," and he then asked "that it be excluded on that basis." The transcript before us does not contain a written request for disclosure. Therefore, we cannot determine whether the request made, and apparently some form of request was made, included such objects as the coat. Appellant argued in support of his objection that if he had known about the coat he would have wanted "an opportunity to look at the coat, examine it," but after the coat was offered in evidence no request for such an opportunity was made to the trial court.

We cannot say with certainty that the failure to disclose the intent to introduce the coat in evidence was a violation of the discovery rules, but assuming that it was, the decisive question is whether the failure to disclose resulted in fundamental unfairness or prejudice to appellant. *State v. Moten*, 542 S.W.2d 317, 320 (Mo.App. 1976); *State v. Smothers*, 605 S.W.2d 128 (Mo. banc 1980). When non-compliance with an applicable discovery rule is called to the attention of the court, the trial court is given the discretion to "order * * * disclosure * * *, grant a continuance, exclude such evidence, or enter such other orders as it deems just under the circumstances." Rule 25.16. The only claim of harm made to the trial court resulting from the nondisclosure was that appellant would want to look at and examine the coat, but as noted, he made no request for time to do so. Instead, he limited his request that the coat be excluded from evidence. Under these circumstances we cannot say that the failure to disclose the intention to introduce the coat in evidence resulted in fundamental unfairness or prejudice to appellant, or that the trial court abused its discretion in permitting the coat to be admitted into evidence.

Appellant next asserts that the trial court erred in permitting Dennis Purdy to testify "to the specifics of threats made to him by individuals coming to his home and a fire bombing of his home" because said testimony contained "hearsay statements," and "evidence of another crime," and were "generally inadmissible and prejudicial to [his] rights to a fair trial."

Dennis Purdy, who was called as a witness by the State, testified on direct examination that he identified appellant as the person who robbed and then shot him, but he made no mention of threats to him or of a fire bombing of his house. On cross-examination, in answer to questions asked of him by appellant's counsel, he testified that at one time he had a "change of heart" about his identification of appellant as the one who shot him because he and his wife had been getting "threatening phonecalls,"

he had received "threatening phonecalls on the job," and he "also got a fire bomb thrown in [his] house just to get [him] not to testify." It was further brought out on cross-examination that Dennis Purdy had gone to the prosecutor and told him of the threats and said he wanted to "get from under this case." He also testified on cross-examination that he then went to the appellant's counsel and executed an affidavit to the effect that he had been mistaken in his identification of appellant. Then, on re-direct examination he testified that after he had executed the affidavit he was contacted by the prosecutor and went to the prosecutor's office, and that as he said, he "decided to tell the truth." He was then asked on re-direct examination about an incident that happened the night before the preliminary hearing, and appellant's counsel interrupted "to make an objection and an offer of proof." Counsel for appellant then stated that the witness was going to testify about two men coming to his house telling him not to testify against appellant. The court reminded appellant's counsel that "before we began the trial we were aware that this problem was going to surface," and that counsel had been advised that if he "opened the door" by placing the affidavit of appellant before the jury, the court was going to "permit the State to come in and rehabilitate that witness by its examination as to the state of mind of the witness when he made the affidavit."

Dennis Purdy then testified on re-direct examination that on the night before appellant's preliminary hearing "two guys" unknown to him came to his door, asked for him, and said "[w]e want to offer you some money not to testify" and then "threatened" him, and said "[i]f you appear in court you'll find out." He did not testify on re-direct examination to a fire bombing of his house except to say without objection, that the incident was reported to the police. Other than that the total testimony of a fire bombing was previously brought by appellant on cross-examination.

When we examine the circumstances it is apparent that appellant sought to impeach the testimony of Dennis Purdy as to his identification of appellant as the one who robbed and shot him by showing that prior to trial he had a "change of heart" as to his identification and had made an inconsistent statement in the form of an affidavit in which he asserted that his identification was in error. The essential question is whether, after this was brought out by appellant on cross-examination, the State was entitled to attempt to rehabilitate its witness by showing his state of mind or the reason for the "change of heart" that caused him to make a prior statement inconsistent with his testimony, and if so, was it permissible to show specific occurrences which brought about the change of heart?

The general rule, as stated in 98 C.J.S. Witnesses § 419c and d, is that "[o]n redirect examination a witness may properly be interrogated as to facts, circumstances, or any matter tending to refute, weaken, or remove inferences, impressions, implications or suggestions which might result from testimony or inquiries or cross-examination, although the facts brought out may be prejudicial to the other party," and "[w]here there is a real or apparent inconsistency in the testimony of a witness, he may be questioned on redirect examination to straighten out the inconsistency, * * *." See also *State v. McKinney*, 475 S.W.2d 51 (Mo.1971).

■ To what extent rehabilitation of a witness should be permitted lies primarily in the discretion of the trial court. On direct examination Dennis Purdy identified appellant as his assailant. On cross-examination he admitted that at one time he previously had had a "change of heart" and had stated that he was mistaken in his identification. It was appellant who brought out the witness had had the "change of heart," and it was proper for the State to show on re-direct the reason therefor, and it was within the trial court's discretion to determine to what extent the specific acts of harassment could be shown in order to show the reason for the change. We find no abuse of discretion in this case.

Appellant relies on *State v. Talbert*, 454 S.W.2d 1 (Mo.1970); *State v. Holbert*, 416 S.W.2d 129 (Mo.1967); *State v. Lee*, 486 S.W.2d 412 (Mo.1972); and *United States v. Moss*, 591 F.2d 428 (8th Cir. 1979). None of these cases pertain to the right of the State to rehabilitate an impeached witness by showing why he made the inconsistent statements.

Appellant's fourth point is that the trial court erred in overruling his request for a continuance so that he could "retain other counsel," and in requiring appellant's counsel to represent him when there was a "conflict between [appellant] and the Defense Attorney."

On the morning the case was set for trial and after the court announced it was ready "to call over a jury," appellant personally stated that he "would like him [his retained counsel] to withdraw." In response to a question by the court, appellant's counsel stated that appellant had indicated to him only that morning that he wanted him to withdraw as counsel. Appellant stated to the court: "I don't believe Mr. Thomas [his counsel] has adequately represented me in this charge as far as pretrial proceedings and whatever, * * * and if he can't adequately defend me before trial I don't see how he can be of any use during trial." Appellant stated that he had tried to call his attorney without success, but had not written to him. Although the court displayed extreme patience and repeatedly requested appellant to be specific as to his complaints, the substance of appellant's complaint may be summarized by his answer that "[m]y main complaint is that I don't feel as though he adequately represented me." The only specific thing mentioned by appellant was that although his counsel had filed a motion to suppress identification testimony, which motion was then pending, he believed that he "should have filed that when these charges were brought to his attention over a year ago." Appellant's counsel advised the court that he had filed the motion after a previous trial, which resulted in a mistrial, because he had "found out that the identification was in some degree suggestive." When the court asked appellant if the "only thing you're objecting to is the failure to file that motion" at the first trial, he replied "No, I'm objecting to his representation of me solely pertaining to this charge," and "I don't feel that he's lived up to the representation that I'm entitled to." Appellant's counsel advised the court that he was ready to proceed, and the court told appellant that it would afford him time to talk to his counsel and discuss any new matter with him. Appellant replied, "I don't have anything to talk over with him."

Appellant's counsel had represented him on a previous trial of this case which resulted in a mistrial, and it appears that he also represented appellant on the trial of an unrelated case which resulted in a conviction for murder, and which was then on appeal.

■ The granting of a continuance is within the discretion of the trial court, and every intendment in favor of the trial court's action is indulged on appeal. *State v. Cheesebrew*, 575 S.W.2d 218, 225 (Mo. App.1978). Appellant's counsel had been retained by him, and his right to change by hiring different counsel, or by seeking appointive counsel if eligible to do so, is limited to the extent that it infringes on the public's right to an effective and efficient administration of justice. *State v. Jefferies*, 504 S.W.2d 6 (Mo.1974). It is only where the accused can justify the need to change counsel and can demonstrate that he was not dilatory in seeking other representation that he can be entitled to a continuance on the day set for trial in order to obtain different counsel.

■ Appellant relies on the statement in *State v. Smith*, 586 S.W.2d 399 (Mo.App. 1979), to the effect that when an accused can demonstrate an irreconcilable conflict with counsel he may be entitled to a continuance to obtain new counsel. We find no

irreconcilable conflict between counsel and client here, and there is nothing to indicate that appellant's counsel was not prepared to adequately represent him. The right to change counsel cannot be used to defeat or destroy the orderly process of the administration of justice. *State v. Crider*, 451 S.W.2d 825 (Mo.1970). We find no abuse of discretion in the refusal to grant a continuance.

Appellant's challenge to his conviction and sentence of imprisonment for three years under Count II of the information for armed criminal action must be sustained. *Sours v. State*, 603 S.W.2d 592 (Mo. banc 1980). The conviction for armed criminal action is vacated and set aside.

Appellant next asserts that he was unconstitutionally twice placed in jeopardy "due to the fact that a mistrial on the charges had previously been granted as the result of prosecutorial misconduct in playing to the jury a video taped statement of a State's witness which contained highly prejudicial statements which the witness was led to make by the prosecutor and thus the mistrial operates as a bar to a subsequent trial."

This court authorized the record to be supplemented to show the circumstances of the mistrial. From the record now before us it appears that the following occurred.

In the first trial, as in this trial, after Dennis Purdy identified appellant as the one who robbed and then shot him, appellant sought to impeach the witness by showing that he had made a prior inconsistent statement in the form of an affidavit in which he asserted that his previous identification of appellant was in error. It appears that after Dennis Purdy had made the affidavit, the prosecutor took a video taped statement from him in which he stated that what he had said in the affidavit was not correct, and in which he set forth his reasons for making the incorrect affidavit. In

an effort to rehabilitate the witness the State proposed to play the video tape to the jury. Appellant objected to the use of the video tape because it was "cumulative evidence and it serves no other purpose than to prejudice defendant's right to a fair trial, and it reiterates evidence of other crimes, specifically fire bombing, threats, intimidation." Objection was also made to statements in the video tape "made by the prosecutor that are leading and suggestive to the victim * * *." A transcript of what was said on the video tape was furnished to and read by the court. After reading the transcript the court commented that "[i]t's completely leading and there's no question that it's completely threatening." There was then a comment that "[y]ou [the prosecutor] threatened him [Dennis Purdy] with perjury prosecution and threatened him with the loss of his job." This latter comment apparently was based on a statement by the prosecutor, as read by the court from the video tape transcript, made to Dennis Purdy as follows: "And you were told, among other things, that you were a young man that was relatively intelligent and had a good service record and essentially a good job, that if you were convicted of perjury for lying on the stand, you'd wind up losing the job and, in fact, what we're going about was the fact that you were going to lie about the identification and say this wasn't the man, is that right?"[2] After further discussion and notwithstanding the above observations by the court, it subsequently ruled that it was going "to permit the video tape to be shown and full statement of counsel for the defendant to be shown, because unless I do so, the excerpts referred to by counsel by the State and counsel for the defendant in both statements would lead to nothing but confusion of the jury and I think it would be the only possible way of straightening out the confusion caused by the excerpts to let the jury hear both statements verbatim and I'm going to

---

**2.** This is not the precise language contained in the transcript of the video tape, but the variances are insignificant.

do that."[3] The video tape was then played before the jury. Appellant immediately moved for a mistrial for the reason "that evidence of other crimes [has] been brought out that flagrantly places defendant's right to a fair trial in jeopardy on the grounds, specifically, that the evidence of other crimes was mentioned about the fact of the murder [charge] that was currently pending against [appellant] which had [not] been brought out before this about any murder, and on this basis I ask the Court to to declare a mistrial." The prosecuting attorney attempted to justify the use of the video tape on the basis that it was material to the issue of the "state of mind" of Dennis Purdy. Apparently it was his contention that knowledge on the part of Dennis Purdy that appellant was charged with murder in an unrelated case would be material to explain why he made the affidavit inconsistent with his testimony. The trial court sustained the motion of appellant and granted a mistrial. In doing so it commented that "[t]here was a statement in there that was completely not admissible" which was "with respect to a pending murder charge against [appellant]."[4] Thus the mistrial was granted at the express request of appellant and for the precise reason advanced by him.

 The Double Jeopardy Clause of the Fifth Amendment protects a defendant in a criminal proceeding against multiple punishments or repeated prosecutions for the same offense.[5] Since the early case of *United States v. Perez*, 9 Wheat. 579, 6 L.Ed. 194, it has been the established rule that whether under the Double Jeopardy Clause there can be a new trial after a mistrial has been declared without the defendant's request or consent depends on whether "there is a manifest necessity for the [mistrial], or the ends of public justice would otherwise be defeated." See also, *Illinois v. Somerville*, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1972); *United States v. Jorn*, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1970); *United States v. Scott*, 437 U.S. 82, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978); and *State v. Aguilar*, 478 S.W.2d 351 (Mo.1972). But as stated in *United States v. Dinitz*, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1975), "[d]ifferent considerations obtain, however, when the mistrial has been declared at the defendant's request." It was stated in *United States v. Martin*, 561 F.2d 135 (8th Cir. 1977) that "[t]he Double Jeopardy Clause generally would not stand in the way of reprosecution where the defendant has requested a mistrial." See also *United States v. Tateo*, 377 U.S. 463, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964); *Lee v. United States*, 432 U.S. 23, 97 S.Ct. 2141, 53 L.Ed.2d 80 (1977); *Madison v. State*, 533 S.W.2d 252 (Mo.App.1976); *State*

---

3. We cannot determine of what the "excerpts" consisted, but we assume they were taken from the video tape and the affidavit. We do not know what is referred to by "full statement of counsel for the defendant."

4. The reference to the murder charge was as follows:

"Q [Mr. Rogers, prosecutor] Well, * * * you know we can give you as much help as possible. We can send a police out there. We can talk to every member of the family that we know about. But we just—this man just cannot be let out on the street. He has got a murder charge pending.

"A I understand.

"Q And he has this case pending. And to be quite frank with you the people involved in the murder case are not nice people. They are people with criminal records in terms—victims I am talking about. They are just about as bad as the defendant. You are an outstanding citizen yourself. You are intelligent and after our talk earlier late in the late part of June, there is no doubt in my mind that you are positive about your identification but it's just the fear for the safety of your family that has made you do that?

"A Exactly."

5. The provision of Art. I, § 19 Constitution of Missouri that "nor shall any person be put again in jeopardy of life or liberty for the same offense, after being once acquitted by a jury," does not strictly apply since appellant was not acquitted by a jury, but the Double Jeopardy Clause of the Fifth Amendment was held to be applicable to the states through the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

*v. Irving,* 559 S.W.2d 301 (Mo.App.1977). The reasons for the distinction were set forth in *United States v. Jorn,* as follows:

> "If that right to go to a particular tribunal is valued, it is because, independent of the threat of bad-faith conduct by judge or prosecutor, the defendant has a significant interest in the decision whether or not to take the case from the jury when circumstances occur which might be thought to warrant a declaration of mistrial. Thus, where circumstances develop not attributed to prosecutorial or judicial overreaching, a motion by the defendant for a mistrial is ordinarily assumed to remove any barrier to reprosecution, even if the defendant's motion is necessitated by prosecutorial or judicial error."

In *United States v. Dinitz,* it is further stated that "[t]he distinction between mistrials declared by the court *sua sponte* and mistrials granted at the defendant's request or with his consent is wholly consistent with the protections of the Double Jeopardy Clause. Even when judicial or prosecutorial error prejudices a defendant's prospects of securing an acquittal, he may nonetheless desire 'to go to the first jury and, perhaps, end the dispute then and there with an acquittal.' * * * Our prior decisions recognize the defendant's right to pursue this course in the absence of circumstances of manifest necessity requiring a sua sponte judicial declaration of mistrial. But it is evident that when judicial or prosecutorial error seriously prejudices a defendant, he may have little interest in completing the trial and obtaining a verdict from the first jury. The defendant may reasonably conclude that a continuation of the tainted proceeding would result in a conviction followed by a lengthy appeal and, if a reversal is secured, by a second prosecution. In such circumstances, a defendant's mistrial has objectives not unlike the interests served by the Double Jeopardy Clause—the avoidance of the anxiety, expense, and delay occasioned by multiple prosecution."

The United States Supreme Court has recognized limited circumstances where a defendant's mistrial request does not remove the Double Jeopardy bar. *United States v. Martin,* supra. For example, the Double Jeopardy Clause protects a defendant against a governmental maneuver to cause a mistrial which allows the prosecution to strengthen its case. *Downum v. United States,* 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963). It also bars retrials where the underlying error is "motivated by bad faith or undertaken to harass or prejudice" the defendant. *United States v. Dinitz,* supra. Thus, when there results a "prosecutorial overreaching," *United States v. Jorn,* supra, the interests protected by the Double Jeopardy Clause outweigh society's interest in conducting a second trial ending in acquittal or conviction. *United States v. Wilson,* 534 F.2d 76 (6th Cir. 1976).

Appellant's point is limited to "prosecutorial misconduct" resulting from "playing to the jury a video taped statement * * * which contained highly prejudicial statements which the witness was led to make by the prosecutor." We note here that this was not the reason advanced by appellant when the mistrial was requested, and it is not the reason set fourth by the trial court for granting a mistrial. Nowhere in the point nor in argument under the point does appellant set forth what he considers to constitute the "highly prejudicial" statements the witness was led to make. Also, we find nothing in the point to the effect that the error which brought about the declaration of a mistrial was motivated by bad faith or was undertaken to harass appellant.

Prior to the taking of any evidence in the pending case, the trial court conducted a hearing on appellant's motion to dismiss on the grounds that to retry the case after the mistrial had been granted would constitute Double Jeopardy. The principal argument presented by appellant at that hearing was that after the mistrial was granted the State requested a continuance and endorsed

additional witnesses, and that this indicated bad faith on the part of the prosecution in offering in evidence the video tape. At the conclusion of this hearing the trial court ruled that "[t]here is insufficient evidence that the prosecution acted in bad faith in this situation and the motion will be overruled and denied."

We agree with the finding of the trial court and conclude there is no basis for the contentions that the mistrial resulted from bad faith on the part of the prosecution, or that there was any intention to harass appellant. In retrospect it is evident that the use of the video tape in the previous trial was ill-advised. However, mere negligence on the part of the prosecutor, *United States v. Martin*, supra, or trial error not involving bad faith, *United States v. Jorn*, supra, will not constitute what is referred to in *United States v. Dinitz*, supra, as "prosecutorial overreaching." The trial court did not err in refusing appellant's motion to dismiss based on Double Jeopardy.

Appellant's final point is that the trial court erred in not declaring a mistrial "when it came to the Court's attention that it had failed to read instruction MAI-CR 2.01 [MAI-CR2d 2.01] to the jury in its entirety immediately after the jury was sworn."

During the jury deliberation appellant's counsel advised the court that his notes indicated that the court had failed to read the instructions mandated by MAI-CR2d 2.01 and 2.02. However, appellant's point is limited to an alleged failure to read Instruction MAI-CR2d 2.01. These two instructions are to be read immediately after the jury is sworn. Notes on Use MAI-CR2d 2.01. But, it was not until after the opening statements of counsel, the taking of testimony consisting of almost 250 pages in the transcript, closing arguments of counsel, and deliberation by the jury for one hour and twenty-six minutes that counsel for appellant first indicated to the court that he had made a notation in his notes that the court had failed to read MAI-CR2d 2.01 and 2.02. The court immediately conducted a rather extensive evidentiary hearing, and based on its memory, its notes made at the time, and the evidence received at the hearing, it found as a fact that the two instructions were properly read in their entirety. Appellant did not request a mistrial, but he apparently now contends that under the circumstances the court should have directed a mistrial without such a request.

Aside from the issue of whether by reason of the delay in calling the matter to the court's attention appellant waived the reading of MAI-CR2d 2.01, if it was in fact not read, after a careful reading on our part of the testimony at the evidentiary hearing, it is sufficient to say that the court's finding is supported by the evidence, and the record discloses no reason to disturb the court's finding.

The judgment as to armed criminal action is reversed and the appellant discharged as to that charge. See *State v. Haggard*, 619 S.W.2d 44 (Mo. banc 1981). The remainder of the judgment is affirmed.

PER CURIAM:

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the court.

WELLIVER, P. J., and HIGGINS and SEILER, JJ., concur.